DAVID ALLEN GREIL, Plaintiff-Appellant, v. TRAVELODGE INTERNA-
TIONAL, INC., *et al.*, Defendants-Appellees.

First District (2nd Division) Nos. 1—87—2372, 1—87—2762 cons.

Opinion filed June 30, 1989.

SCARIANO, J., dissenting.

James M. Dupree, Aron D. Robinson, and Kevin P. Gadbois, all of Holstein, Mack & Dupree, of Chicago, for appellant.

Robert Marc Chemers and Robert J. Franco, both of Pretzel & Stouffer, Chartered, of Chicago, for appellees.

PRESIDING JUSTICE BILANDIC delivered the opinion of the court:

Plaintiff, David Greil, appeals from the circuit court order dismissing, with prejudice, his action against defendant, LaSalle Ohio Enterprises, Inc. (LaSalle), and a subsequent order granting summary judgment in favor of defendant, Travelodge International, Inc. (International). Each appeal was filed immediately after the respective orders were entered. These appeals, Nos. 87—2372 and 87—2762, have been consolidated.

On January 22, 1983, plaintiff, David Greil, was a paying guest at a motel located at 545 North La Salle Street in Chicago, Illinois. The motel was advertised, designated and operated under the name "Travelodge in the Heart of Chicago."

Travelodge International, Inc. (International), is a California corporation duly authorized to do business in the State of Illinois. International owns the trademark "Travelodge" under which it operates a national network of motor hotels principally through the grant of a license to others to use its mark. Such a license was granted for use of

the trademark "Travelodge" for the motel at 545 North La Salle Street in Chicago, Illinois.

On January 22, 1983, a robber entered plaintiff's room at the motel. In an attempt to escape, plaintiff jumped from a window in his second-story room to the sidewalk, thereby sustaining personal injuries. On January 16, 1985, approximately one week before the expiration of the statute of limitations, plaintiff filed a multicount complaint against International, the franchisor, and "Travelodge in the Heart of Chicago."

Summons and a copy of the complaint were served on "Travelodge in the Heart of Chicago" on February 4, 1985, by leaving a copy with Miss Kathleen O'Brien as agent at the motel office in Chicago. "Travelodge in the Heart of Chicago" filed a special and limited appearance and subsequently filed a motion to dismiss on the ground that it was not a legal entity and, therefore, could not be sued. An affidavit executed by Ludovico Bongiovanni revealed that LaSalle Ohio Enterprises, Inc., an Illinois corporation, was the entity that was granted the license to use the "Travelodge" trade and service marks for the operation of the motel at 545 North La Salle Street in Chicago, Illinois.

This caused plaintiff to file an amended complaint on November 20, 1985, naming LaSalle as an additional party defendant. After receipt of process, LaSalle entered its appearance and a motion to dismiss through the same law firm that appeared for codefendant "Travelodge in the Heart of Chicago." LaSalle's section 2—619 motion to dismiss (Ill. Rev. Stat. 1985, ch. 110, par. 2—619) asserted that the action was barred because it was served on December 4, 1985, which was more than 10 months after the expiration of the two-year statute of limitations.

After a hearing on the "Travelodge in the Heart of Chicago" motion to dismiss and a hearing on LaSalle's motion to dismiss, the trial court, on January 16, 1987, entered an order granting both motions. "Travelodge in the Heart of Chicago" was dismissed because it was not a legal entity. LaSalle was dismissed because the trial judge decided that the misnomer rule did not apply (Ill. Rev. Stat. 1987, ch. 110, par. 2—401); that plaintiff did not come within the requirements of relation back under section 2—616 (Ill. Rev. Stat. 1987, ch. 110, par. 2—616(d)); and that, therefore, the amended complaint was barred by the statute of limitations (Ill. Rev. Stat. 1987, ch. 110, par. 13—202).

First, we will consider plaintiff's appeal from the order dismissing LaSalle.

## I

Plaintiff presents two questions of law regarding the motion to dismiss LaSalle. The first is whether the circumstances of this action present a case of misnomer. (Ill. Rev. Stat. 1985, ch. 110, par. 2—401.) The second is whether the relation-back theory of section 2—616(d) applies. (Ill. Rev. Stat. 1985, ch. 110, par. 2—616(d).) Because we find that the circumstances of this action present a case of misnomer, it is not necessary to discuss the merits of relation-back.

Plaintiff contends that he sued the real party in interest, the business operating the "Travelodge in the Heart of Chicago" motel, but did so under the wrong name. Section 2—401(b) of the Illinois Code of Civil Procedure provides:

> "Misnomer of a party is not a ground for dismissal but the name of any party may be corrected at any time, before or after judgment, on motion, upon any terms and proof that the court requires." Ill. Rev. Stat. 1987, ch. 110, par. 2—401(b).

■ It is well settled that whether a case involves misnomer depends upon whom plaintiff intended to sue (*Ashley v. Hill* (1981), 101 Ill. App. 3d 292, 427 N.E.2d 1319, *appeal denied* (1982), 91 Ill. 2d 551), and whether the real party in interest is sued (*Leonard v. City of Streator* (1983), 113 Ill. App. 3d 404, 447 N.E.2d 489). A determinative factor in deciding whether misnomer applies is whether the party sued actually exists. *Thielke v. Osman Construction Corp.* (1985), 129 Ill. App. 3d 948, 951, 773 N.E.2d 574 ("It seems clear that plaintiff did not have a mistaken belief as to the identity of defendant. This conclusion is enforced by the fact that there is no corporation in existence named Osmond"); *Clinton v. Avello* (1982), 105 Ill. App. 3d 336, 338, 434 N.E.2d 355, *appeal denied* (1982), 91 Ill. 2d 568 ("The most probative evidence of who a plaintiff intended to sue is the party named by the plaintiff in the complaint. If such a party in fact exists, but is not the real party in interest, a court can conclude that the plaintiff has mistakenly sued the wrong party").

In *Ingram v. MFA Insurance Co.* (1974), 18 Ill. App. 3d 560, 309 N.E.2d 690, *appeal denied* (1974), 56 Ill. 2d 587, the court rejected defendant's argument that a judgment against it was void because suit was brought in a name that was merely a trade name for a group of insurance companies. Plaintiff sued "MFA Insurance Company" and served a purported agent of MFA. The true name of the company, however, was Countryside Casualty Company, a Missouri corporation. "MFA Insurance Company" was nothing more than a name, a nonentity. In correcting the misnomer and allowing plaintiff to amend the name of the defendant, the court stated:

"[I]n view of the admissions of record which indicate a telephone listing and the doing of business under the name of MFA Insurance Company, we find that plaintiff's reliance on the name in designating the defendant was reasonable. Further, the amendment required is not a substantive matter but a formal one and in conformity with the record. [Citations.] We note also that counsel for defendant has appeared on behalf of 'MFA Insurance Company' throughout, has filed an affidavit stating he is the attorney for the defendant, MFA Insurance Company. \*\*\* Accordingly, we have decided to correct the misnomer \*\*\*." 18 Ill. App. 3d at 566.

■■ The identical situation presents itself in the instant case. Plaintiff sued "Travelodge in the Heart of Chicago" and served its purported agent. However, the true name was LaSalle Ohio Enterprises, Inc., an Illinois corporation (LaSalle). Although under the wrong name, plaintiff actually served an agent of LaSalle; Miss Kathleen O'Brien. O'Brien's duties at the motel include opening the mail and also working behind the desk. Legal documents were forwarded by O'Brien to Ludovico Bongiovanni, the president of LaSalle.

The franchise/license agreement between International and LaSalle was executed on behalf of LaSalle by Ludovico Bongiovanni, President. The agreement authorized LaSalle to use the trademark "Travelodge" for the operation of a motor hotel at 545 North La Salle Street, Chicago, Illinois. That motel is listed in the Chicago telephone directory as "Travelodge in the Heart of Chicago." LaSalle and "Travelodge in the Heart of Chicago" share the same legal counsel. Thus, all of the vital signs that made a case for misnomer in *Ingram* are also present in this case.

"Names are nothing. The gist of the matter is, were the parties in interest actually served." (*Pond v. Ennis* (1873), 69 Ill. 341, 344.) We therefore conclude that this defendant was aware that "Travelodge in the Heart of Chicago" and LaSalle were one and the same. As in *Ingram*, "we have decided to correct the misnomer."

The authorities relied upon by the trial court and defendant are not persuasive. In *Leonard v. City of Streator* (1983), 113 Ill. App. 3d 404, 447 N.E.2d 489, dramshop plaintiffs sued an individual under the belief that the individual was the owner and operator of a tavern. In fact, the real owner and operator was a corporation. There were two separate entities: an individual and a corporation. Plaintiffs did not misname the right party, but named the wrong party. Thus, there was no misnomer.

Similar facts exist in *Marsden v. Neisius* (1955), 5 Ill. App. 2d

396, 126 N.E.2d 44. In that case, plaintiff brought an action naming a corporation as defendant. The real defendant was an individual. Thus, again there are two separate entities: an individual and a corporation. As in *Leonard*, the plaintiff did not misname the right party, but named the wrong party. It was a mistake and not a misnomer.

In the case at bar there was only one entity; not two separate entities. Plaintiff intended to sue the company operating as "Travelodge in the Heart of Chicago." Plaintiff served the registered agent of La-Salle when the true name of the corporation was discovered. This was done despite the fact that O'Brien could have been served as an agent of the corporation. (See *A-Z Equipment Co. v. Moody* (1980), 88 Ill. App. 3d 187, 410 N.E.2d 438.) Plaintiff served the proper physical party because the agent served for "Travelodge in the Heart of Chicago" is also an agent of LaSalle. The only defect is that the correct name is LaSalle. Same entity, wrong name.

Code pleading was adopted in this State because procedural pitfalls of common law pleading often denied litigants an opportunity to have their differences determined on the merits. (*Miller v. Enslen* (1978), 60 Ill. App. 3d 865, 868, 377 N.E.2d 282.) The Code of Civil Procedure provides that "[t]his Act shall be liberally construed, to the end that controversies may be speedily and finally determined *according to the substantive rights of the parties*." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 110, par. 1—106.

One purpose of the misnomer provision of the Code is to avoid dismissal of cases on a purely technical basis and to allow the action to reach its substantive merits. The spirit and letter of the Code make this a case of misnomer which the plaintiff has a right to correct. The trial court erred in depriving the plaintiff the opportunity to correct the misnomer.

## II

Plaintiff next argues that the trial court erred in granting summary judgment in favor of International, contending that there is a question of material fact as to the relationship between International and LaSalle.

International is a corporation organized and existing under the laws of the State of California. It is duly qualified to do business in the State of Illinois. On June 1, 1978, it entered into a franchise/license agreement with LaSalle, an Illinois corporation. This agreement gave LaSalle the right to use International's "Travelodge" trademarks and service marks in the operation of a motel located at 545 North La Salle Street in Chicago, Illinois. LaSalle agreed to pay In-

ternational a fee and to maintain the high standards of International's "Travelodge" trade and service marks, by agreeing to operate and maintain the motel "in a clean, *safe* and orderly manner." (Emphasis added.) LaSalle agreed to follow the standards and procedures set forth in the operations manual provided by International. Deviation was not permitted without the written consent of International.

International was also granted the right to supervise the motel operations. LaSalle was required to send its personnel responsible for management of the motel to International's training program. These and other provisions were designed to insure that LaSalle's operation under the "Travelodge" mark would "maintain the highest standards of hospitality." Substantial violation of these covenants by LaSalle could result in a cancellation of the license granted by International. LaSalle was also required to indemnify and hold International harmless for personal injuries arising in connection with its operations of the motel and to place public liability insurance "for the benefit" of International as well as LaSalle.

The trial court granted International's motion for summary judgment because it could find nothing in the pleadings or the franchise/license agreement that indicated International may have been responsible for the safety provisions alleged to have been breached. The trial court also held that plaintiff's argument that the agreement at least created an apparent agency was immaterial.

The business franchise system provides an effective means by which to increase sales of trademark goods or services. It begins with a sale by the franchisor to the franchisee of a license to use that particular trademark. Under the Lanham Act, the owner of a trademark may license the mark provided that he adequately controls the licensee. (15 U.S.C. §1127 (1982).) The criterion regarding the control necessary to satisfy the Lanham Act is whether such control guarantees that third parties dealing with the franchisee will receive goods or services of the quality which they have learned to associate with the trademark. (S. Rep. No. 1333, 79th Cong., 2d Sess. (1946).) Depending upon the control expressed in the franchise agreement, either an actual agency or ostensible agency may be found.

In its motion for summary judgment, International referred to provisions of the license agreement and principally cited Illinois authorities. Whether by inadvertence or deliberate design, International did not call the trial court's attention to significant provisions in the agreement which state that the agreement was "entered into at El Cajon, California" and "shall be governed by and construed in accordance with the laws of the State of California." While International did

not deny that California law applied, it chose not to emphasize that point. The application of California law, as required by the agreement, leads us to the conclusion that the trial court erred in granting summary judgment for International.

 California law is clear that a franchisee may be deemed to be the agent of the franchisor and that the question of whether the franchisee is an agent is ordinarily one of fact. (*Kuchta v. Allied Builders Corp.* (1971), 21 Cal. App. 3d 541, 98 Cal. Rptr. 588.) California courts have found both types of agency to exist in the franchise context. *Beck v. Arthur Murray, Inc.* (1966), 245 Cal. App. 2d 976, 54 Cal. Rptr. 328 (ostensible agency); *Nichols v. Arthur Murray, Inc.* (1967), 248 Cal. App. 2d 610, 56 Cal. Rptr. 728 (actual agency).

An actual agency exists if the franchisor has imposed controls beyond that necessary to protect its trademark. (62 Am. Jur. 2d *Private Franchise Contracts* §16 (1972).) Courts generally look to the extent of the franchisor's involvement in day-to-day operations, noting that what is important is the extent of control which the franchisor is permitted to exercise, rather than that which it actually exercised. (*Nichols v. Arthur Murray, Inc.* (1967), 248 Cal. App. 2d 610, 56 Cal. Rptr. 728.) Courts will look at the franchise agreement as well as operating and training manuals for evidence of control.

 In the franchise agreement, terms dictating that the facility be built and maintained according to specifications and requiring certain operational procedures are indicia of control as well as the requirement that the franchisee permit regular inspections by franchisor's inspectors to ensure compliance with procedures. (*Wood v. Holiday Inns, Inc.* (5th Cir. 1975), 508 F.2d 167.) Also, terms providing that substantial violations of any of the covenants of the franchise agreement give the franchisor the right to cancel the license have been held to be indicative of control. (508 F.2d at 175.) Other examples of control include minimum price fixing (508 F.2d at 174); approval by franchisor of all advertising (508 F.2d at 177); profit sharing (*Arthur Murray, Inc. v. Smith* (1971), 124 Ga. App. 51, 183 S.E.2d 66); and book auditing (*Kuchta v. Allied Builders Corp.* (1971), 21 Cal. App. 3d 541, 98 Cal. Rptr. 588).

The plaintiff had a right to expect a "clean, safe and orderly" accommodation at premises bearing the "Travelodge" mark. It is obvious that the agreement between International and LaSalle was designed to provide a guest and invitee with such accommodations by maintaining the "highest standards of hospitality."

The intrusion of a criminal committing a robbery in plaintiff's room at the motel and causing the plaintiff to jump from his second-

story room to the sidewalk below, at least, creates a disputed question of fact as to whether International, LaSalle, or both failed to provide plaintiff with "clean, safe and orderly" accommodations and failed to maintain the "highest standards of hospitality."

■ The license agreement gave International the right to inspect LaSalle's operation under the "Travelodge" mark. It exercised this right on a frequent and regular basis. Among the many items checked, found deficient, and called to LaSalle's attention for correction were matters involving the safety of guests. We note from the record that lighting of the parking area, locks on the premises and latches and locks on windows were called to the attention of LaSalle for correction. Whether the intrusion of the criminal into the room of the plaintiff, or other guests, might or could have been prevented creates a question of material fact.

We, therefore, conclude that the pleadings, license agreement and its incorporated operations manual sufficiently involve International in day-to-day operations of the motel to raise a question of fact as to whether an actual agency relationship existed between International and LaSalle.

■ In addition to actual agency, a franchisor may be held liable as principal for the acts and omissions of a franchisee where the franchisee has ostensible authority to act for the principal. If a third party reasonably believes that the franchisee is authorized to bind the principal, or is acting for the principal, an agency relationship may be held to have been created. See *Beck v. Arthur Murray, Inc.* (1966), 245 Cal. App. 2d 976, 54 Cal. Rptr. 328.

Courts are influenced by such factors as common advertising, common telephone listings, and common trademark usage in signs, posters, or cards. All these factors are present in the instant case. Further, there is no evidence in the record to indicate that third parties were informed that the motel in question operating in Chicago under the "Travelodge" mark was distinct and independent from International. See *Beck*, 245 Cal. App. 2d 976, 54 Cal. Rptr. 328 (obvious disclaimer sign may shield franchisor from liability).

We therefore also conclude that the issue of ostensible agency between International and LaSalle, based on the record before us, presents a disputed question of fact.

The franchise system depends on an effective monopoly, in which a franchisee will pay to participate. (Comment, *Liability of a Franchisor for Acts of the Franchisee*, 41 S. Cal. L. Rev. 143 (1968).) The franchisor is the primary benefactor; thus, the franchisor is in the better position to distribute losses. (Comment, *A Franchisor's Liability*

*for the Torts of his Franchisee,* 5 U.S.F. L. Rev. 118 (1970).) Imposing liability on the franchisor is a strong incentive for franchisors to exercise great care in selecting their franchisees and, in turn, protect the public interest. See Comment, *A Franchisor's Liability for the Torts of his Franchisee,* 5 U.S.F. L. Rev. 118, 122 (1970).

■■ Summary judgment should not be granted unless the pleadings, depositions, admissions and affidavits "show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c).) The summary judgment tool is not used to try an issue of fact, "but rather to determine whether one exists." (*Weber v. Northern Illinois Gas Co.* (1973), 10 Ill. App. 3d 625, 635, 295 N.E.2d 41.) Hence, if all the evidence is viewed most favorably for the nonmovant and facts are present upon which reasonable persons could disagree or if they lead to inferences that can be fairly drawn and present different conclusions, then summary judgment should not be granted. *Nolan v. Johns-Manville Asbestos & Magnesia Materials Co.* (1979), 74 Ill. App. 3d 778, 794, 392 N.E.2d 1352, *aff'd* (1981), 85 Ill. 2d 161, 421 N.E.2d 864.

■■ Based on the record in this case, there is a genuine issue of material fact as to the existence of an actual or ostensible agency relationship between International and LaSalle. Therefore, we find that the trial court erred in granting summary judgment in favor of International.

Accordingly, the judgment of the circuit court of Cook County is reversed and this cause is remanded for further proceedings consistent with the view expressed herein.

Reversed and remanded.

PINCHAM, J., concurs.

JUSTICE SCARIANO, dissenting:
I respectfully dissent.

MISNOMER

The majority relies on *Ingram v. MFA Insurance Co.* (1974), 18 Ill. App. 3d 560, 209 N.E.2d 690, in support of its determination that this is a case of misnomer rather than mistaken identity. In that case, a default judgment was entered against defendant and the trial court subsequently denied defendant's motions for entry of an order quashing the summons and to vacate the judgment. On appeal, defendant

argued that MFA Insurance Co., a trade name under which four companies, MFA Mutual Insurance Co., Countryside Casualty Co., MFA Security Finance Co., and MFA Life Insurance Co., did business was a nonentity and that, therefore, service on an agent for these companies was not service on an agent for MFA Insurance Co. The court refused to quash the summons, holding that under all the evidence presented, service was obtained on an agent for defendant. The agent, Campbell, testified that MFA Insurance Company was an umbrella organization which "controll[ed] or govern[ed]" Countryside Casualty Company, MFA Mutual Insurance Company and MFA Life Insurance Company. (18 Ill. App. 3d at 564.) An attorney for MFA Mutual Insurance Company testified that Campbell was an agent for the four companies doing business under the trade name of "MFA Insurance Company." There was also testimony that defendant received and cashed checks made payable to MFA Insurance Company. Based on this evidence, the court held that Campbell was a proper agent for service for defendant.

The court also declined to vacate the judgment, stating that defendant's argument that MFA Insurance Company was a nonentity was "without merit. Where summons is served upon a party and the circumstances are such as to indicate that he is the person intended to be sued, he is subject to the judgment even though the process and judgment do not refer to him by his correct name." 18 Ill. App. 3d at 566.

The appellate court then granted plaintiff's motion to amend the name of the party defendant to Countryside Casualty Co., a Missouri Corporation, d/b/a MFA Insurance Co. The court noted that the amendment was not a substantive one; that a telephone listing and the doing of business were under the name MFA Insurance Co.; that counsel for defendant appeared on behalf of MFA Insurance Co. and filed an affidavit stating that he is the attorney for that concern; that policies were issued under the heading MFA Insurance Co.; and that a request for admission of fact had been answered by an attorney for MFA Insurance Co. 18 Ill. App. 3d at 566.

*Ingram* does not address the issues in the case at bar because there the court held that MFA Insurance Company was an entity capable of being sued. Here, the trial court relied on *Marsden v. Neisius* (1955), 5 Ill. 2d 396, 126 N.E.2d 444, in holding that the instant case does not involve misnomer.

In *Marsden*, plaintiff sued to recover damages suffered as a result of being struck by a truck, naming "C. & H. Transfer Company, a Wisconsin Corporation," as defendant. Summons was served upon

Arthur Rodden as agent for the corporation, and Rodden forwarded it to Edward Neisius. An answer was filed, and as a separate defense Neisius alleged that he "engaged in a business conducted as a proprietorship under the name and style 'C. & H. Transfer,'" that Rodden was his agent to receive process, that he did receive service through Rodden, and that there was no "C. & H. Transfer" corporation. Marsden subsequently amended his complaint to name Edward Neisius, d/b/a C. & H. Transfer, as defendant. The trial court granted Neisius' motion to dismiss, in which he contended that he was sued after the applicable status of limitations had run, but the appellate court reversed, stating:

> "Undoubtedly, the plaintiff intended to sue a corporation ***. The plaintiff surely alleged the 'C. & H. Transfer Company, a Corporation' was involved, but it is later alleged by an answer that there is no 'C. & H. Transfer Company, a Corporation'; there is a 'C. & H. Transfer,' for Edward J. Neisius informs the plaintiff in his answer that he had notice of the suit, and that he is doing business under the style of 'C. & H. Transfer.'

> We believe that under these facts and circumstances Edward J. Neisius thereby implies that he is the one intended to be sued, and we believe that by filing this answer, Edward J. Neisius, suggests and concedes that there is a misnomer. [Citation.] Having filed his answer as such we believe that he is estopped from now asserting there is no misnomer. But without the answer of Edward J. Neisius in the form as filed herein, we would agree with appellee that there is a mistake in identity, of the person sued, and we would then *** hold that the cause of action did not accrue until the filing of the amended complaint *** and the suit would consequently *** be barred by the statute of limitations." *Marsden*, 5 Ill. App. 2d at 400-01.

*Ingram* and *Marsden* are both second district cases; however, *MFA* neither discussed, distinguished nor overruled *Marsden*, because the two cases involved different facts and applied separate and distinct principles of law. In *Marsden*, plaintiff sued a nonentity but the court held that because defendant had filed an answer, he was estopped from asserting that there was no misnomer. As noted previously, and contrary to the majority's assertion, the court in *Ingram* rejected defendant's argument that the named defendant was a nonentity.

The majority seems to suggest that because LaSalle did business under the name "Travelodge in the Heart of Chicago," it should be prepared to defend a suit under that name. That is not the law. The majority fails to cite any conduct on the part of LaSalle which would

estop it from asserting that there is no misnomer; I do not believe the fact that it was listed under "Travelodge" in the Chicago telephone directory is a basis for denying LaSalle its right to be sued in its proper name. In this regard, I note that there is no allegation that LaSalle violated the assumed name statute (Ill. Rev. Stat. 1985, ch. 96, par. 4) or the Business Corporation Act of 1983 (Ill. Rev. Stat. 1985, ch. 32, par. 4.05), or any other law. The fact that the name of the motel was "Travelodge in the Heart of Chicago," with no "Inc.," "Corp.," "Ltd.," or "Co." at the end of its name, any of which designations is required to signify that it was a corporation (Ill. Rev. Stat. 1987, ch. 32, par. 4.05), should have alerted plaintiff that the motel was operating under an assumed name, as is quite legal and proper in Illinois. (Ill. Rev. Stat. 1987, ch. 96, par. 4.) Plaintiff could easily have checked the index of assumed names at the office of the Cook County clerk and learned that defendant's proper name is LaSalle Ohio Corporation, d/b/a Travelodge in the Heart of Chicago. (Ill. Rev. Stat. 1987, ch. 96, par. 6.) This simple step was apparently not taken. To excuse plaintiff's failure to investigate is to reward indolence; in addition, the court penalizes a defendant which scrupulously followed the law.

SUMMARY JUDGMENT

Although the license agreement does state that it shall be construed in accordance with California law, both plaintiff and Travelodge International argued Illinois law in the trial court and in this court, totally oblivious to the provisions of the agreement as to the applicable law. Moreover, neither party cited any of the cases relied upon by the majority; in fact, they cited no California law at all. The majority opinion places the burden on Travelodge International to bring this choice of law provision to the trial judge's attention and, while I do not disagree that all parties have a responsibility to bring relevant facts and points of law before the court, I believe it should be pointed out that plaintiff at no time directed the court's attention to either California law or the provision in the agreement signifying the law applicable to its provisions.

It goes without saying that the parties may frame the issues in litigation as they choose; accordingly, it is not the proper function of this court to become an advocate or to raise matters in which the parties clearly have no interest. Nor is it fair to the circuit court judge to reverse him on an issue not raised before him by any of the parties. The principle is a bit too hoary for us to be toying with it now. Therefore, I do not believe California law is applicable to this issue.

Nor do I believe that the trial court erred in granting defendant's

motion. In his response to Travelodge International's motion for summary judgment and in the hearing on that matter, plaintiff relied upon the following provisions in the license agreement to support his allegation that Travelodge International was responsible for the lack of security in the hotel:

"6(a). Licensee agrees to maintain its premises and accommodations in a clean, safe and orderly manner;

6(e). Licensee agrees to repair and paint the exterior and interior of building at reasonable times and to maintain the exterior and interior of buildings in a clean, orderly and sanitary condition;

6(f). Licensee agrees to permit inspection by licensor;

6(k). Licensee agrees to send its management and operation personnel to licensor's training program;

12(a). Licensor agrees to consult with licensee;

12(e). Licensor agrees to maintain supervision;

13. Licensee agrees to refrain from alteration or construction unless licensor approves plans; and

15. Licensee agrees to hold licensor harmless and to indemnify licensor."

The majority relies primarily on 6(a) in holding that there is a question of fact as to whether Travelodge International can be held responsible for the safety violations alleged to have been violated here.

In granting Travelodge International's summary judgment motion, the trial court stated:

"[T]he issues relating to motions for summary judgment are framed by the pleadings. And the pleadings specifically set forth in Paragraph 4A through N, [are] matters dealing with security and criminal attacks by third parties. Specifically, the failure to warn the plaintiff relating to the risk of criminal attacks. Failure to properly provide, failing to provide locking door[s]. Prohibit the entrance by unauthorized persons onto the premises. Failure to provide safety measures. Failure to provide sufficient peepholes, or night chains, or an electronic surveillance or security staffs. Safety devices and measures in 4B. Evaluate security needs in 4C. And several sub-sections alleged in the—in more general terms. But all these sub-paragraphs which are alleged to be the breach of duty by the defendant is [sic] absolutely nowhere indicated as being substantiated by the response of the motion for summary judgment.

The law is clear as far as motions for summary judgment is [sic] concerned that the plaintiff-respondent need not prove his

case at the summary judgment stage. \*\*\* [M]any other cases indicate that; but they also indicate that the responding plaintiff must at least set forth some facts that arguably indicate a cause of action. \*\*\* I don't see one iota of fact whatsoever as set forth in the license agreement or any other documents or anything else in response to the motion that indicates arguably any facts that Travelodge International, Inc., had anything to do with these items spelled out in Paragraph 4 of the amended complaint."

The question of the responsibility of the owner of a franchise trademark for the torts of its franchisee was discussed in *Coty v. U.S. Slicing Machine Co.* (1978), 58 Ill. App. 3d 237, 272 N.E.2d 1371. In that case, an employee of a Yankee Doodle Dandy restaurant, the franchisee, sued the franchisor on a theory of negligence and willful and wanton misconduct, as well as the manufacturer of the machine she had been using when injured. Under the franchise agreement "numerous restrictions were imposed upon the franchisee relating to the general nature of the operation of the restaurant, [with the principal goal of] protecting the Yankee Doodle trademark and the good will associated with it." (58 Ill. App. 3d at 239.) The franchisee agreed that its managers would be trained by the franchisor, its employees would wear distinctive uniforms, and it would comply with the franchisor's rules on minimum hours and days of service and on contributions and participation in advertising programs. The franchisee was also required to comply with all Federal, State and local laws. The franchisor did not retain any day-to-day control, and it could not hire or fire anyone, stop work immediately or give orders to the franchisee's employees. The franchisor was required to give a 10-day written notice demanding cure of any breach of the franchise agreement by the franchisee, and could terminate the agreement if such cure was not forthcoming. (58 Ill. App. 3d at 240.) The appellate court affirmed a directed verdict for the franchisor, holding that the "general right to rescind the contract or 'call off work' is insufficient \*\*\* to subject the franchisor to liability under either agency or employer-independent contractor theories." 58 Ill. App. 3d at 242.

In so deciding the court relied on *Murphy v. Holiday Inns, Inc.* (1975), 216 Va. 490, 219 S.E.2d 874. In that case, plaintiff had slipped and fallen at a Holiday Inn owned by the Betsy-Len Corporation, a franchisee. She sued the franchisor on the theory that it owned and operated the motel and that its agents and employees were negligent. The appellate court affirmed the trial court's granting of summary judgment in favor of the franchisor, finding that there was no princi-

pal-agent or master-servant relationship under the franchise agreement. That agreement provided that the franchisee contribute to advertising campaigns and that its managers be trained by the franchisor, and that the franchisee operate its motel under the "system" which included the trademark, color schemes, furnishings, advertising services and methods of operation. (*Coty*, 58 Ill. App. 3d at 240.) The court stated:

> " 'Having carefully considered all of the regulatory provisions in the agreement, we are of the opinion that they gave defendant no "control or right to control the methods or details of doing the work," *** and, therefore, agree with the trial court that no principal-agent or master-servant relationship was created. *** The regulatory provisions did not give defendant control over the day-to-day operation of Betsy-Len's motel. While defendant was empowered to regulate the architectural style of the buildings and the type and style of furnishings and equipment, defendant was given no power to control daily maintenance of the premises. Defendant was given no power to control Betsy-Len's current business expenditures, fix customer rates, or demand a share of the profits. Defendant was given no power to hire or fire Betsy-Len's employees, determine employee wages or working conditions, set standards for employee skills or productivity, supervise employee work routine, or discipline employees for nonfeasance or misfeasance. All such powers and other management controls and responsibilities customarily exercised by an owner and operator of an on-going business were retained by Betsy-Len.' " *Coty*, 58 Ill. App. 3d at 241, quoting *Murphy v. Holiday Inns, Inc.* (1975), 216 Va. at 495, 219 S.E.2d at 877-78.

In *Yassin v. Certified Grocers of Illinois, Inc.* (1987), 150 Ill. App. 3d 1052, 502 N.E.2d 315, plaintiff, a three-year-old child, was injured when she placed her left hand in an operating commercial meat tenderizer. She sued Mizyed-Yassin Corporation, the owner of the grocery store where the accident took place, Certified, a cooperative with which the grocery store was affiliated, the company that manufactured the tenderizer and an independent testing laboratory. The appellate court upheld the circuit court's directing of a finding for Certified, citing *Coty* and stating:

> "[I]n the present case, Certified had, at most, a franchise relationship with Mizyed-Yassin Corporation, and its franchise agreement dealt only with methods of payment and procedures for delivery of goods the franchisee ordered from it—not safety.

Certified's only remedy for a violation of its rules was to withdraw permission to use its name and terminate the agreement. Plaintiff's father and her uncle both testified that they exercised day-to-day control over the grocery store and that they alone had the power to hire and fire employees. There was no agent-principal relationship and no evidence that Certified had the authority to compel or prevent Mizyed-Yassin or its employees from operating the tenderizer in a manner that resulted in plaintiff's injury. We conclude that Certified cannot be held liable in this case under a principal-agent theory." 150 Ill. App. 3d at 1069.

The franchise agreement in the instant case is similar to those in *Coty, Murphy* and *Yassin*. Travelodge International did not have daily control over the upkeep of the premises and was not responsible for safety measures, or lack thereof, at "Travelodge in the Heart of Chicago." Travelodge International's only remedy for a violation of its agreement with LaSalle was to terminate the franchise agreement, and "[t]his general right to rescind the contract *** is insufficient *** to subject the franchisor to liability under either agency or employer-independent contractor theories." (*Coty v. U.S. Slicing Machine Co.* (1978), 58 Ill. App. 3d 237, 242, 373 N.E.2d 1371; *Yassin*, 150 Ill. App. 3d at 1068.) Therefore, Travelodge International cannot be held liable for LaSalle's alleged safety violations, and the trial court properly granted summary judgment in its favor.