942 So.2d 817 (2006)
William D. ALLEN, Deceased, by and through Darlene W. Allen, his Widow, as his Personal Representative; and Darlene W. Allen, Individually, Appellants.
v.
CHOICE HOTELS INTERNATIONAL, Appellee.
No. 2005-CA-00045-COA.
Court of Appeals of Mississippi.
November 21, 2006.
*819 Mark D. Lumpkin, Biloxi, Jennifer P. Burkes, Gulfport, James R. Reeves, attorneys for appellants.
James E. Welch, William E. Whitfield, Gulfport, attorneys for appellee.
Before KING, C.J., SOUTHWICK and IRVING, JJ.
IRVING, J., for the Court.
¶ 1. This appeal arises out of an action filed by Darlene Allen, individually, and as the wrongful death heir of her husband, William Allen, for his death and her injuries *820 at a Gulfport Comfort Inn. The action was filed against R.C.P. Enterprises d/b/a Comfort Inn, the franchisee, and R.D. Patel, its managing partner, (collectively, the Comfort Inn) and against Choice Hotels International (Choice), the franchisor. This appeal is against Choice only. Darlene claims that Choice failed to provide reasonable security to protect guests at the hotel and, as a result, she and her husband were harmed by the criminal acts of an intruder. The trial court entered summary judgment on behalf of Choice, finding that the franchisor was not vicariously liable because it did not control or have the right to control the day-to-day operation of the hotel.
¶ 2. Darlene asserts five issues on appeal, all of which question the propriety of the grant of summary judgment. Therefore, we discuss them as subparts of the central issue.
¶ 3. Finding no error, we affirm.

FACTS
¶ 4. On October 25, 1996, the Allens, who were from Galveston County, Texas, finished visiting a Gulfport casino and returned to their room at the Comfort Inn. Unbeknownst to them, a trio of individuals from Montgomery, Alabama, was surveilling the casino parking lot looking for someone to rob. The three had decided to visit the Mississippi Gulf Coast and rob a non-Mississippian at one of the casinos. Upon seeing a Texas tag on the Allens' van, the trio followed the Allens back to the Allens' hotel. Presumably by pretense, one robber got William to answer the door. After the door was opened, the robber and an accomplice pushed their way into the Allens' room and struggled with William over his wallet. During the struggle, William was fatally shot, and Darlene was injured.

STANDARD OF REVIEW
¶ 5. The law is well established with respect to the grant or denial of a motion for summary judgment. The appellate court applies a de novo standard of review concerning the propriety of a trial court's grant or denial of summary judgment. Montgomery v. Woolbright, 904 So.2d 1027, 1029(¶ 7) (Miss.2004). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). To survive a motion for summary judgment, the opposing party must establish that there is a genuine issue of material fact. Matthews v. Horseshoe Casino, 919 So.2d 278, 280(¶ 5) (Miss.Ct.App.2005) (citing Lowery v. Guaranty Bank & Trust Co., 592 So.2d 79, 81 (Miss.1991)). The adverse party may not rest upon the mere allegations or denial of the pleadings, but instead, in its response, the party must set forth facts showing that there is a genuine issue for trial. Miller v. Meeks, 762 So.2d 302, 304(¶ 3) (Miss.2000). The evidentiary matters are viewed in the light most favorable to the non-moving party. Id. Following this examination, if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgment is affirmed. Id.

ANALYSIS AND DISCUSSION OF THE ISSUES
Traditional Agency Analysis
¶ 6. The parties have provided us no Mississippi cases or authority on the liability of a franchisor to patrons of its franchisee who are harmed by the acts of a third party on the franchised premises, nor have we been able to find any authority *821 after diligent search and inquiry. However, there is extant Mississippi law regarding when a third party, such as Choice, can be held liable for acting as the master of another party. "Our cases in the field revolve around the idea of control. The right to control is as important as de facto control at the tortious moment, for the right to control the work of another `carries with it the correlative obligation to see to it that no torts shall be committed' by the other in the course of the work." Fruchter v. Lynch Oil Co., 522 So.2d 195, 199 (Miss.1988) (quoting White's Lumber & Supply Co. v. Collins, 186 Miss. 659, 672, 191 So. 105, 106 (1939)). Therefore, one who controls, or has the right to control, the work of another may be liable as the master of that party. However, the potential control does not create liability unless the alleged master had the right to control the means as well as the ends. "There is another fact premise sometimes pointing to non-liability: If the party . . . is concerned only with ultimate results and not the details of [the] work." Id.
¶ 7. In Kisner v. Jackson, 159 Miss. 424, 428-29, 132 So. 90, 91 (1931), the Mississippi Supreme Court expounded a non-exclusive list of factors that are to be used in determining whether a party is the master of another party:
(1) Whether the principal master has the power to terminate the contract at will;
(2) whether he has the power to fix the price in payment for the work, or vitally controls the manner and time of payment;
(3) whether he furnishes the means and appliances for the work;
(4) whether he has control of the premises;
(5) whether he furnishes the materials upon which the work is done and receives the output thereof, the contractor dealing with no other person in respect to the output;
(6) whether he has the right to prescribe and furnish the details of the kind and character of work to be done;
(7) whether he has the right to supervise and inspect the work during the course of the employment;
(8) whether he has the right to direct the details of the manner in which the work is to be done;
(9) whether he has the right to employ and discharge the subemployees and to fix their compensation; and
(10) whether he is obliged to pay the wages of said employees.
¶ 8. Applying these factors, we find that Choice did not act as a master to the Comfort Inn. Choice did not pay the hotel staff's wages, Choice did not have the right to hire or terminate "subemployees" or fix their wages, and Choice had no right to direct the details of the operation of the Comfort Inn. While the Rules and Regulations contained many specific requirements, Choice did not have the right to tell Comfort Inn how to conduct its day-to-day business, such as what hours employees would work or what hours the hotel should be open. Furthermore, Choice did not have the right to tell the Comfort Inn what rate to rent its rooms at, nor could Choice terminate the franchise agreement at will. While some of the other factors might support a finding that Choice acted as the master of the Comfort Inn, the factors as a whole indicate that the Comfort Inn was not Choice's servant.
Liability in the Franchise Context
¶ 9. Other jurisdictions that have addressed the question of a franchisor's vicarious liability have noted that a franchise relationship is far different from a contract of employment where the rules of master/servant are typically applied. Kerl *822 v. Dennis Rasmussen, Inc., 273 Wis.2d 106, 682 N.W.2d 328, 337 (2004). Because of this difference, courts have held the franchisor vicariously liable only when it had the right to control the specific instrumentality or aspect of the business that was alleged to have caused the harm. Id. at 340. We find this application of the law to be consistent with Mississippi law, which has consistently refused to hold the employer of an independent contractor liable unless the employer was maintaining a "right of control over the performance of that aspect of work which gave rise to the injury." Cashwell v. Fincher, 914 So.2d 1250, 1253(¶ 7) (Miss.2005) (quoting Magee v. Transcontinental Gas Pipe Line Corp., 551 So.2d 182, 186 (Miss.1989)). Furthermore, the Mississippi Supreme Court has stated that "the main element required to constitute the relationship of master and servant is that the servant be subject to the control of the master in carrying on the business at the time of the injury." Estate of Stovall v. Deweese Lumber Co., 222 Miss. 833, 837, 77 So.2d 291, 293 (quoting Kisner, 159 Miss. at 428, 132 So. at 91).
¶ 10. With these principles in mind, we turn to the specific facts of the case at hand. Because the Allens were harmed by an alleged deficiency in the Comfort Inn's security, we must look to whether Choice exercised control over, or had the right to control, the hotel's security. At oral argument, Darlene's counsel urged this Court to find that Choice's requirements about motel doors show that Choice exercises control over the safety system at the hotel. Choice requires that a guest room entry door be a minimum of two inches in width and have a 180-degree door viewer, commonly called a peephole. A deadbolt lock is also required on the door, and security bars must be placed on any sliding doors. We are not persuaded that these requirements show enough control to shift responsibility for safety to Choice. We note again that it is not only results that a franchisor must control, but also the means to those ends. These few requirements regarding hotel doors do not show that Choice had the right to control both the means and the ends of security at the Comfort Inn.
¶ 11. Our review of this issue is consistent with that of other courts, which have generally granted summary judgment for a franchisor after finding the franchisor did not control the franchisee's day-to-day operation, as will be discussed infra.[1] A general summation of the relationship between a franchisor and its franchisee in a vicarious liability setting is found in Kerl, where summary judgment was granted to the franchisor, Arby's, Inc., on a claim of negligent failure to supervise a work-release inmate who was temporarily employed at an Arby's restaurant. Kerl, 682 N.W.2d at 331. The inmate left Arby's without permission and went to another location, where he shot his former girl-friend and killed her fiancé. Id.
¶ 12. The court said that, in the typical franchise arrangement, the franchisee operates "an independent business pursuant to a license to use the franchisor's trademark or trade name." Id. Usually the franchise arrangement involves a detailed *823 agreement "designed to protect the integrity of the trademark by setting `uniform quality, marketing, and operational standards.'" Id. The court eschewed applying a broad rule of franchisor vicarious liability, stating that, before vicarious liability can be imposed on the franchisor, a "precisely focused test" must be applied. Id. at 331-32. The court, which, like this Court, was also considering the issue as a case of first impression, examined similar cases and found that "the marketing, quality, and operational standards commonly found in franchise agreements are insufficient to establish the close supervisory control or right of control necessary to demonstrate the existence of a master/servant relationship for all purposes or as a general matter." Kerl, 682 N.W.2d at 332.
¶ 13. As already mentioned, the court noted that a franchise relationship is far different from a contract of employment where the rules of master/servant are typically applied. Id. at 337. Because of this difference, the Kerl court found that a franchisor should be held vicariously liable only when it had the right to control the specific instrumentality or aspect of the business that was alleged to cause the harm. Id. at 340. Applying these principles, the Wisconsin Supreme Court found that Arby's had no control over the supervision of the franchisee's employees and thus was not vicariously liable for negligent supervision of the employee in question. Id. at 342.
¶ 14. In a somewhat factually similar case involving Choice and another Comfort Inn, a federal district court found summary judgment proper after determining that Choice did not control the hotel's daily operation or security and fire safety systems. Allen v. Greenville Hotel Partners, Inc., 409 F.Supp.2d 672 (D.S.C.2006). In Allen, two estate representatives and an injured hotel guest sued Choice and others for wrongful deaths and injuries suffered in a fire set by an arsonist at a Comfort Inn. Id. at 674. The plaintiffs claimed that Choice was negligent for failing to provide adequate security and fire protection at the Comfort Inn. Id. The court looked at the franchise agreement and said that the purpose of the agreement was merely to maintain "uniform service within, and public good will toward, the [Choice] system" so as to ensure a similar experience for hotel patrons. Id. at 677 (quoting Hayman v. Ramada Inn, Inc., 86 N.C.App. 274, 357 S.E.2d 394, 397 (1987)). The court found that summary judgment was warranted, as the franchisor did not control the hotel's daily operations, nor did it control the specific instrumentality which allegedly caused the harmthe hotel's security and life safety systems. Id. at 679-80.
¶ 15. In Hayman, a motel patron was assaulted by a third party on the grounds of a Ramada, Inn, the franchisee. Hayman, 357 S.E.2d at 395. The patron sued the franchisor for failing to maintain adequate security. Id. The court, finding that the franchisor exerted no control over the daily operation of the Ramada Inn, held that summary judgment was appropriate. Id. at 397. The court said:
The general purpose of the [franchise agreement] is the maintenance of uniform service within, and public good will toward, the Ramada Inn system. Otherwise, [the franchisee] operates the facility on its own behalf. The agreement primarily requires [the franchisee] to comply with certain standards in the construction, furnishing, and advertising of the facility. Apart from the imposition of a general duty upon [the franchisee] to maintain its accommodations "in a clean, attractive, safe and orderly manner," the twenty-page contract imposes *824 no standards nor makes any other provision with respect to security of the premises.
Id.
¶ 16. The court also rejected the plaintiff's contention that, by requiring the franchisee to maintain liability insurance naming the franchisor as an additional insured and to indemnify the franchisor for claims, the franchisor implicitly accepted responsibility and acknowledged liability for injuries on the premises. "This type of indemnity contract concerns only the two parties thereto, is not germane to plaintiff's cause of action, and may not be used to establish defendant's liability." Id. at 398 (citing Greene v. Charlotte Chem. Labs., Inc., 254 N.C. 680, 120 S.E.2d 82 (1961)).
¶ 17. In our case, the eighteen-page franchise agreement grants the franchisee, R.C.P. Enterprises, use of "the system." The agreement defines "the system" as "a plan and system for providing to the traveling public lodging of a high standard of service, courtesy, and cleanliness, utilizing distinctive identification schemes, standards, specifications, and Proprietary Marks and information."[2] A part of the system requires the franchisee to use Choice's advance registration system and to display the Comfort Inn logo in all advertising. The franchisee must post signs showing the franchisee's participation in Choice's business referral and credit card arrangement. In return, Choice receives a one-time affiliation fee of $35,000 and monthly royalty fees from use of the rooms. Choice also agrees to pay marketing and reservation fees.
¶ 18. In paragraph 17(a)(1) of the franchise agreement, the parties agree that the contract does not create a fiduciary relationship between them. The agreement provides that the franchisee is an independent contractor and says that "nothing in this Agreement is intended to constitute either party as an agent, legal representative, subsidiary, joint venturer, partner, employee, independent contractor or servant of the other for any purpose whatsoever." Further, in paragraph 17(b), R.C.P. is required to "hold itself out to the public as an independent contractor operating the hotel pursuant to a franchise agreement from [Choice]." Also, in the same paragraph, R.C.P. agrees to exhibit, in a conspicuous place in the lobby of the hotel, notice of the independent contractor relationship.
¶ 19. In paragraph 5 of the agreement, Choice agrees to (1) lend R.C.P. an operations and service manual which sets out the operation of the system in management and administration of the hotel, (2) provide an initial orientation program for R.C.P. and its employees with R.C.P. paying the expenses of the employees' training, (3) consult with and advise R.C.P. about renovations necessary to bring the hotel within compliance with the standards in the system, (4) use certain monies, collected from R.C.P., for national and international advertising, publicity and promotion including the publication and distribution of a directory of hotels affiliated with Choice, (5) use certain monies collected from R.C.P. to maintain advance reservation services, and (6) periodically inspect the hotel in order to evaluate the R.C.P.'s compliance with the franchise agreement and Choice's rules and regulations. In Paragraph 22(e) of the agreement, Choice and R.C.P. acknowledge and *825 agree that, notwithstanding the terms and conditions of the agreement, R.C.P. retains "ordinary business control" and "is solely responsible for the day-to-day operations of the hotel."
¶ 20. Our review of the franchise agreement in this case indicates that the agreement, like the agreements discussed in other cases, is meant to provide a system of uniformity for Choice franchisees. This summation of the purpose of the agreement is supported by the agreement's definition of "the system": "a plan and system for providing to the traveling public lodging of a high standard of service, courtesy, and cleanliness, utilizing distinctive identification schemes, standards, specifications, and Proprietary Marks and information." In other words, the franchisee is operating a hotel that is designed to look like other Comfort Inns, so that customers feel as though they are not staying in a completely different hotel.
¶ 21. Darlene's central argument is that the agreement, along with the imposition of extensive rules and regulations upon R.C.P. by Choice, proves that Choice retains the right of control. The "Rules and Regulations" is a 145-page proprietary document that covers numerous items with which R.C.P. must comply, including construction requirements and operational requirements pertaining to all Comfort Inns. In further support of its summary judgment motion, Choice presented the deposition testimony of a Choice corporate representative, Robert Kerr. When questioned regarding different aspects of the operation of a Comfort Inn by a franchisee, Kerr insisted at every turn that Choice did not control the hotel's daily operations. The plaintiffs presented no sworn testimony to contradict or dispute Kerr's testimony, and there was no admission in Kerr's testimony that Choice controlled customer safety on the franchised premises. When a motion for summary judgment is made and supported as provided in Rule 56 of the Mississippi Rules of Civil Procedure, the opposing party may not rest upon mere allegations or denial of his pleadings, but must set forth specific facts by affidavit or otherwise to show that there is a genuine issue for trial. M.R.C.P. 56(e). Therefore, Darlene failed to present a genuine issue of material fact as to whether Choice exercised control over the day-to-day operation of the Comfort Inn.
¶ 22. Notably, another court considering Choice's rules and regulations in a tort setting found that the rules and regulations did not establish enough control by Choice to find it liable. In Anderson v. Turton Dev., 225 Ga.App. 270, 483 S.E.2d 597, 598 (1997), the plaintiff sued the franchisee and Choice for negligence after her slip and fall on a handicap parking ramp in a Comfort Inn parking lot. The plaintiff's claim against Choice rested on a theory of agency based upon the franchise contract and its rules and regulations. Id. at 600. The court rejected the claim and said:
The agreement sets forth the terms and conditions under which [the franchisee] may be licensed to operate a hotel or motel using the name "Comfort Inn," and the rules and regulations impose various building, construction, and operational requirements, "not to permit [Choice] to direct or control the time, manner and method of performance of the daily operations of the franchise but as a means of achieving a certain level of quality and uniformity within [its] system."
Id. at 601 (quoting McGuire v. Radisson Hotels Int'l, 209 Ga.App. 740, 435 S.E.2d 51, 53 (1993) (examining a Radisson franchise agreement and operating manual and rejecting a negligence claim against the franchisor, Radisson Hotels International, for injuries suffered by a guest)). See also *826 Hong Wu v. Dunkin' Donuts, Inc., 105 F.Supp.2d 83, 91 (E.D.N.Y.2000) (examining a Dunkin' Donuts franchise agreement and concluding that the franchisor's right to enforce standards designed to maintain uniform appearance and services are not sufficient to find vicarious liability for a claim of negligence for an assault on a franchisee's employee on the franchise premises).
Franchises and Trademarks
¶ 23. Typically, a franchisor's principal asset is its trademark. As a result, a consideration in franchise cases that is not found in other vicarious liability cases is the control that a franchisor must exert over the franchised premises in order to protect its trade or service mark. Under the federal Lanham Act[3] act, an owner may lose its trademark if the trademark is used in a manner that causes the mark to lose its significance as an indication of origin, i.e. if the trademark ceases to represent in the public's mind the item or subject which the mark originally symbolized. 15 U.S.C. § 1127 (2000). Thus, the trademark owner must preserve his asset and protect the public against deceptive uses of the trademark, which typically means the franchisor must regulate the franchisee.[4] In a typical franchise agreement, there are detailed requirements regarding the franchisee's operation of the franchise. One writer notes that imposing liability on a franchisor for control over day-to-day operations of a franchise could unfairly penalize the franchisor, which "must exercise a high degree of control to protect [its] trade or service mark under the Lanham Act." Michael R. Flynn, Note, The Law of Franchisor Vicarious Liability: A Critique, 1993 COLUM. BUS. L.REV. 89, 99. Franchises which distribute goods and services require a high degree of control by the franchisor in order to protect the goodwill value of the product and the trademark associated with the business:
For example, a distributor of gasoline does not really need to specify the exact shape, layout, and color scheme of a service station franchise to protect the trademark on its petroleum products. On the other hand, such details might be critical to the validity of the service mark of a McDonald's restaurant, a Blockbuster Video store, or a 7-Eleven convenience store.
Id. at 100.
¶ 24. The Greenville Hotel Partners court considered whether a Choice franchisee agreement, with its right to enforce standards designed to maintain uniform appearance and service, was sufficient to give rise to vicarious liability. The court found that the rules and regulations are a way "to ensure a similar experience" at all Comfort Inns, thereby maintaining public goodwill toward the Choice franchise. Greenville Hotel Partners, 409 F.Supp.2d at 677 (quoting Hayman, 357 S.E.2d at 397). Likewise, the Kerl court said that "the detailed quality and operational standards and inspection rights specified in the franchise agreement are integral to the protection of the franchisor's trade or service mark under the *827 Lanham Act." Kerl, 682 N.W.2d at 338 (citations omitted). "The purpose of the Lanham Act . . . is to ensure the integrity of registered trademarks, not to create a federal law of agency . . . [or to] automatically saddle the licensor with the responsibilities under state law of a principal for his agent." Id. (quoting Oberlin v. Marlin Am. Corp., 596 F.2d 1322, 1327 (7th Cir.1979)).
¶ 25. Thus it appears that, in the business of franchising, franchisors "are not always necessarily using a franchise relationship as a bad faith `end-run' around the rule of employer liability. Rather, franchise agreements often prescribe rigid control over day-to-day business functions because they otherwise risk non-compliance with the Lanham Act," and ultimately the loss of the trademark. Flynn, supra, at 101.
Apparent Authority
¶ 26. Mississippi cases have also found vicarious liability where "a party holds itself out as offering services to the public and . . . consumers are reasonably led to believe that they are doing business with that party. . . ." Fruchter, 522 So.2d at 200. Thus, in Elder v. Sears Roebuck & Co., 516 So.2d 231, 234-35 (Miss.1987), the Mississippi Supreme Court held Sears liable, notwithstanding the fact that the store in question was run by an "independent" third party, because Sears held itself out to the public as the entity that the public was doing business with. However, in this case, Choice required that R.C.P. Enterprises display, in a prominent location in the hotel's lobby, a sign indicating that the Gulfport Comfort Inn was run by an independent party, and not by Choice. Therefore, Choice did not lead the public to believe that customers were doing business with Choice.
Negligence Elements
¶ 27. Finally, we note that summary judgment is also required due to another failure in Darlene's proof. "The elements of a negligence action are well-settled in Mississippi. A plaintiff in a negligence suit must prove by a preponderance of the evidence (1) duty, (2) breach of duty, (3) causation, and (4) injury. To recover, a plaintiff must prove causation in fact and proximate cause." Patterson v. Liberty Assocs., L.P., 910 So.2d 1014, 1019(¶ 14) (Miss.2004) (citations omitted). The Patterson court explained that proximate cause is a cause "without which the result would not have occurred." Id. (quoting Delahoussaye v. Mary Mahoney's, Inc., 783 So.2d 666, 671(¶ 13) (Miss.2001)). No evidence has been offered in this case to show that any security measures, or lack thereof, were a proximate cause of the Allens' injuries. Therefore, even if we were to find that Choice could be held vicariously liable for the Comfort Inn's security measures, summary judgment would still be appropriate because no genuine issue of material fact as to causation has been created.
¶ 28. In conclusion, we note that the majority view is that the franchisor must control or have the right to control the "specific instrumentality" that caused the plaintiff's harm for a court to apply vicarious liability. In looking at whether there is an agency relationship between the franchisor and the franchisee, the majority of courts do not consider the rules and regulations, which are part of the franchise agreement, as a measure of direction and control. Instead, the courts find that these very specific and strict rules are a way for the franchisor to protect its trademark and to protect the public. We find no evidence in the record which would show that Choice had the right to control the day-to-day activities of the Gulfport Comfort Inn. Without such a showing of *828 control or right to control, the franchisor should be granted summary judgment.
¶ 29. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] In a minority of cases, courts have found enough control by the franchisor to allow the case to go to a jury. Greil v. Travelodge Int'l, Inc., 186 Ill.App.3d 1061, 133 Ill.Dec. 850, 541 N.E.2d 1288 (1989) (applying an enterprise theory to hold that because the franchisor reaps the benefits in profits and goodwill of the franchise enterprise it also should bear the burden for the activities of the franchisee). Some of the cases finding vicarious liability are noted at Phoebe Carter, Franchisor's Tort Liability for Injuries Allegedly Caused by Assault or Other Criminal Activity on or Near Franchise Premises, 2 A.L.R.5th 369, 1992 WL 767498 (1992).
[2] "`Proprietary Marks' or `Marks' means the trademarks and service marks Comfort, Comfort Inn, Comfort Hotel, and Comfort Suites, either alone or in combination with logotypes, signs, emblems designated by [Choice], together with such other marks which [Choice] may from time to time authorize in writing for use in connection with the System."
[3] The Trademark Act of 1946, commonly known as the Lanham Act, is codified in approximately forty-five sections of Title 15, Chapter 22, of the U.S.Code and is the principal source of federal statutory law regarding trademarks and unfair competition.
[4] Herbert B. Chermside, Jr., Annotation, Vicarious Liability of Private Franchisor, 81 A.L.R.3d 764, 1977 WL 45842 (1977).