Robert KERL, General Guardian of Robin Kerl, The Estate of David Jones, Benjamin Jones and Donna Roberts, Plaintiffs-Appellants-Cross-Respondents-Petitioners,

ATTORNEY GENERAL, Wisconsin Department of Health and Family Services, and Wal-Mart Personal Choice, Involuntary-Plaintiffs,

v.

DENNIS RASMUSSEN, INC. and Continental Western Insurance, Unidentified Defendant ABC (Arby's Inc.'s Insurer), Defendants,

ARBY'S INC. d/b/a Triarc Restaurant Group, Defendant-Respondent-Cross-Appellant.

Supreme Court

*No. 02–1273. Oral argument April 6, 2004.—Decided June 29, 2004.*

2004 WI 86

(Also reported in 682 N.W.2d 328.)

WILCOX, J., took no part.

For the plaintiffs-appellants-cross-respondents-petitioners there were briefs by *Daniel W. Hildebrand* and *DeWitt Ross & Stevens, S.C.,* Madison; *Douglas B. Keberle* and *Keberle & Patrykus, LLP,* West Bend; and

*Donald J. Murphy* and *Murphy Vaughan & Pressentin, LLC,* Monona, and oral argument by *Daniel W. Hildebrand.*

For the defendant-respondent-cross-appellant, Arby's Inc., d/b/a Triarc Restaurant Group there was a brief by *Emile H. Banks, Jr., Vicki L. Arrowood* and *Emile Banks & Associates, LLC,* Milwaukee, and oral argument by *Emile Banks.*

¶ 1. DIANE S. SYKES, J. This case involves a claim of franchisor vicarious liability under the doctrine of respondeat superior. At issue is whether and under what circumstances a franchisor may be vicariously liable for the negligence of its franchisee.

¶ 2. The issue arises in the context of a damages lawsuit stemming from a horrific crime. Harvey Pierce ambushed and shot Robin Kerl and her fiancé David Jones in the parking lot of a Madison Wal-Mart where Kerl and Jones worked. Kerl was seriously injured in the shooting, and Jones was killed. Pierce, who was Kerl's former boyfriend, then shot and killed himself. At the time of the shooting, Pierce was a work-release inmate at the Dane County jail who was employed at a nearby Arby's restaurant operated by Dennis Rasmussen, Inc. ("DRI"). Pierce had left work without permission at the time of the attempted murder and murder/suicide.

¶ 3. Kerl and Jones' estate sued DRI and Arby's, Inc. As is pertinent to this appeal, the plaintiffs alleged that Arby's is vicariously liable, as DRI's franchisor, for DRI's negligent supervision of Pierce. The circuit court granted summary judgment in favor of Arby's, concluding that there was no basis for vicarious liability. The court of appeals affirmed.

¶ 4. Vicarious liability under the doctrine of respondeat superior depends upon the existence of a master/servant agency relationship. Vicarious liability under respondeat superior is a form of liability without fault—the imposition of liability on an innocent party for the tortious conduct of another based upon the existence of a particularized agency relationship. As such, it is an exception to our fault-based liability system, and is imposed only where the principal has control or the right to control the physical conduct of the agent such that a master/servant relationship can be said to exist.

¶ 5. A franchise is a business format typically characterized by the franchisee's operation of an independent business pursuant to a license to use the franchisor's trademark or trade name. A franchise is ordinarily operated in accordance with a detailed franchise or license agreement designed to protect the integrity of the trademark by setting uniform quality, marketing, and operational standards applicable to the franchise.

¶ 6. The rationale for vicarious liability becomes somewhat attenuated when applied to the franchise relationship, and vicarious liability premised upon the existence of a master/servant relationship is conceptually difficult to adapt to the franchising context. If the operational standards included in the typical franchise agreement for the protection of the franchisor's trademark were broadly construed as capable of meeting the "control or right to control" test that is generally used to determine respondeat superior liability, then franchisors would almost always be exposed to vicarious liability for the torts of their franchisees. We see no justification for such a broad rule of franchisor vicari-

ous liability. If vicarious liability is to be imposed against franchisors, a more precisely focused test is required.

¶ 7. We conclude that the marketing, quality, and operational standards commonly found in franchise agreements are insufficient to establish the close supervisory control or right of control necessary to demonstrate the existence of a master/servant relationship for all purposes or as a general matter. We hold, therefore, that a franchisor may be held vicariously liable for the tortious conduct of its franchisee only if the franchisor has control or a right of control over the daily operation of the specific aspect of the franchisee's business that is alleged to have caused the harm.

¶ 8. Here, although the license agreement between Arby's and DRI imposed many quality and operational standards on the franchise, Arby's did not have control or the right to control DRI's supervision of its employees. Summary judgment dismissing the plaintiffs' vicarious liability claims against Arby's was properly granted.

## I. FACTS AND PROCEDURAL HISTORY

¶ 9. This is a review of a grant of summary judgment; the facts are taken from the pleadings and other documents on file in connection with the motion for summary judgment. Arby's is a national franchisor of fast-food restaurants. DRI operates an Arby's restaurant on the west side of Madison as an Arby's franchisee.

¶ 10. The relationship between Arby's and DRI is governed by a 1985 licensing agreement pursuant to which DRI is authorized to use Arby's trade name in the operation of a restaurant franchise. Article 1 of the

licensing agreement grants DRI a license to use Arby's trademarks, service marks, and trade names in accordance with Arby's Operating Standards Manual. Subsequent provisions in the agreement contain specific requirements governing, among other things, building design, construction, and remodeling; purchasing; food service and packaging; signage and advertising. The agreement specifies an up-front license fee of $32,500 and monthly royalty payments of 3.5 percent of DRI's gross sales. The agreement requires DRI to comply with all applicable state and federal laws and regulations, and to carry at least $1 million of liability insurance naming Arby's as an additional insured.

¶ 11.   Article 6 of the license agreement addresses the issue of personnel. As to management personnel, the agreement requires a designated officer or shareholder of the licensee to attend an Arby's management training seminar. As to personnel generally, the agreement provides: "LICENSEE shall hire, train, maintain and properly supervise sufficient, qualified and courteous personnel for the efficient operations of the Licensed Business."

¶ 12.   In February 1999, DRI hired Harvey Pierce to work at its restaurant. At the time, Pierce was a work-release inmate at the Dane County Jail. In the mid-afternoon of June 11, 1999, Pierce walked off the job without permission. He then crossed the street to the Wal-Mart store parking lot, where he lay in wait for Robin Kerl, his former girlfriend, and David Jones, her fiancé, both Wal-Mart employees. When Kerl and Jones emerged from the building, Pierce shot them both in the head. He then shot himself. Jones and Pierce died of their injuries. Kerl survived but sustained serious injuries and is permanently disabled.

114

¶ 13. Kerl and Jones' estate sued Arby's and DRI, among others. The complaint alleged several causes of action against DRI: (1) negligent supervision; (2) negligent hiring; (3) negligent retention; (4) nuisance; and (5) breach of third-party beneficiary contract. The plaintiffs alleged that Arby's was liable on the negligent supervision, hiring, and retention claims under theories of "actual or constructive agency," respondeat superior and/or "active negligence," which we interpret to mean direct negligence.

¶ 14. Arby's and DRI moved for summary judgment. The Circuit Court for Dane County, the Honorable Richard J. Callaway, granted summary judgment dismissing all claims against Arby's and dismissing the negligent hiring, nuisance, and breach of third-party beneficiary contract claims against DRI. After the plaintiffs filed a notice of appeal, the circuit court, at Arby's request, entered a further order denying that part of Arby's motion for summary judgment that sought dismissal on public policy grounds, enabling Arby's to cross-appeal on that issue.

¶ 15. The plaintiffs' appeal encompassed only the issue of Arby's vicarious liability, as franchisor, for DRI's alleged negligent supervision of Pierce.[1] The court of appeals affirmed the circuit court. Noting that the issue had not previously been addressed in this state, the court of appeals surveyed case law from other jurisdictions and concluded that the prevailing standard for franchisor vicarious liability focuses on whether the franchisor controls the "specific instrumentality" which

---

[1] The dismissal of the plaintiffs' direct negligence claim against Arby's is not before this court. The circuit court orders dismissing the negligent hiring, nuisance, and breach of third-party beneficiary contract claims against DRI are also not at issue here.

allegedly caused the harm, or whether the franchisor has a right of control over the alleged negligent activity. *Kerl v. Rasmussen*, 2003 WI App 226, ¶ 16, 267 Wis. 2d 827, 672 N.W.2d 71. Accordingly, the court held that "the standard for imposing vicarious liability on a franchisor for the negligent acts of a franchisee requires that the franchisor have a right of control or actual control over the alleged negligent activity." *Id.* at ¶ 30. Because neither the franchise agreement nor the franchise operating manual gave Arby's control or the right to control DRI's employees, the court of appeals affirmed the summary judgment in favor of Arby's. *Id.* at ¶¶ 26–29. This conclusion disposed of the appeal; the court of appeals therefore did not reach the public policy argument raised in Arby's cross-appeal.

## II. STANDARD OF REVIEW

■

¶ 16. We review summary judgments de novo, applying the same methodology as the circuit court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). We will affirm the grant of summary judgment when "the pleadings, depositions, answers and interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Wis. Stat. § 802.08(2) (2001–02).

## III. DISCUSSION

A. Vicarious Liability

■

¶ 17. A person is generally only liable for his or her own torts. *Lewis v. Physicians Ins. Co. of Wis.*, 2001 WI 60, ¶ 11, 243 Wis. 2d 648, 627 N.W.2d 484. Under

certain circumstances, however, the law will impose vicarious liability on a person who did not commit the tortious conduct but nevertheless is deemed responsible by virtue of the close relationship between that person and the tortfeasor. The doctrine of *respondeat superior* ("let the master answer"), less frequently referred to as the master/servant rule, has been well-settled in the law of agency for perhaps as long as 250 years. *See* Floyd R. Mechem, *Outlines of the Law of Agency* § 349, at 237 (4th ed. 1952). Vicarious liability under respondeat superior is "liability that a supervisory party (such as an employer) bears for the actionable conduct of a subordinate or associate (such as an employee) because of the relationship between the two parties." *Black's Law Dictionary* 927 (7th ed. 1999).

¶ 18. "Under the doctrine of respondeat superior, a master is subject to liability for the tortious acts of his or her servant." *Pamperin v. Trinity Mem'l Hosp.*, 144 Wis. 2d 188, 198, 423 N.W.2d 848 (1988); *see also Arsand v. City of Franklin,* 83 Wis. 2d 40, 45, 264 N.W.2d 579 (1978). A prerequisite to vicarious liability under respondeat superior is the existence of a master/servant relationship. *Arsand,* 83 Wis. 2d at 48; *see also* Restatement (Second) of Agency, § 219 (1958).

¶ 19. In *Heims v. Hanke,* this court adopted the definition of "servant" in § 220 of the Restatement (Second) of Agency: "[a] servant is one employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right to control." *Heims v. Hanke,* 5 Wis. 2d 465, 468, 93 N.W.2d 455 (1958) (citing Restatement (Second) of Agency § 220) (partially overruled on other grounds by *Butzow*

117

*v. Wausau Mem'l Hosp.*, 51 Wis. 2d 281, 290, 187 N.W.2d 349 (1971)); *see also* Wis—JI Civil 4030. Conversely, a "master" is "a principal who employs an agent to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service." Restatement (Second) of Agency, § 2(1).

¶ 20.   The master/servant relationship is a species of agency; all servants are agents but not every agent is a servant. *Arsand*, 83 Wis. 2d at 48; *Giese v. Montgomery Ward, Inc.*, 111 Wis. 2d 392, 414–15, 331 N.W.2d 585 (1983). Unless an agent is also a servant, his principal will not be vicariously liable for his tortious conduct except under certain limited circumstances.[2]

¶ 21.   Vicarious liability is a form of strict liability without fault. A master may be held liable for a servant's torts regardless of whether the master's own conduct is tortious. Although a plaintiff who suffers a single injury may plead both vicarious and direct liability claims against a party who is asserted to be a master (as was done here), vicarious liability is a separate and distinct theory of liability, and should not be confused with any direct liability that may flow from the master's own fault in bringing about the plaintiff's harm. Vicarious liability is imputed liability. It is imposed upon an innocent party for the torts of another because the

---

[2] Under the nondelegable duty exception to respondeat superior, a principal may be held liable for a non-servant's tortious acts if the agent was performing responsibilities of the principal that are so important that the principal should not be permitted to bargain away the risks of performance. *See Arsand v. City of Franklin*, 83 Wis. 2d 40, 54 n.8, 264 N.W.2d 579 (1978).

nature of the agency relationship—specifically the element of control or right of control—justifies it.[3]

■

¶ 22. Vicarious liability under respondeat superior typically arises in employer/employee relationships but is not confined to this type of agency. A servant need not be under formal contract to perform work for a master, nor is it necessary for a person to be paid in order to occupy the position of servant. *See* Restatement (Second) Agency, § 225 (1958); Wis JI—Civil 4025. For example, in *Giese,* 111 Wis. 2d at 414, this court held that a child was the servant of his father for purposes of vicarious liability analysis when the child operated a lawn mower at his father's express direction but out of his immediate physical presence. Consistent with the general rule that the master's "business" need not be a "business" as that term is understood in the commercial arena, we emphasized in *Giese* that "the [master's] business need not be an undertaking for profit." *Id.* at 416.

---

[3] We note that several of the cases cited by the parties and relied upon by the court of appeals involved direct (not vicarious) liability claims against franchisors, and focus on the existence of a duty on the part of a franchisor regarding occurrences on the franchisee's premises. *Chelkova v. Southland Corp.,* 771 N.E.2d 1100 (Ill. Ct. App. 2002); *Helmchen v. White Hen Pantry, Inc.,* 685 N.E.2d 180 (Ind. Ct. App. 1997); *Hoffnagle v. McDonald's Corp.,* 522 N.W.2d 808 (Iowa 1994); *Folsom v. Burger King,* 958 P.2d 301 (Wash. 1998). These direct liability cases look to the franchisor's actual control or retained right of control to determine the presence of a duty for purposes of evaluating whether the franchisor was itself negligent. This is distinct from a claim of vicarious liability under respondeat superior, which imputes the servant's negligence against the master without any requirement of fault on the part of the master.

¶ 23. While a servant need not be paid in order to expose the master to liability for the servant's torts, it is well-settled that except under certain limited circumstances, a master will only be liable for torts of the servant committed within the scope of the servant's employment. *Scott v. Min-Aqua Bats Water Ski Club, Inc.*, 79 Wis. 2d 316, 320–21, 255 N.W.2d 536 (1977); Restatement (Second) of Agency § 219(1). A deviation or stepping away from the master's business—a "frolic and detour" in the language of the early common law—may preclude vicarious liability. The question whether a tortfeasor was acting within the scope of employment at the time the injury was inflicted is normally for the jury to determine.[4] This "scope of employment" question is often the main point of contention in a suit for damages predicated on a theory of vicarious liability.

¶ 24. A person who contracts to perform services for another but is not a servant is an independent contractor. *Arsand*, 83 Wis. 2d at 51–52; Restatement (Second) of Agency, § 2(3), cmt. b.; Harold Gill Reuschlein and William A. Gregory, *The Law of Agency & Partnership* § 51, at 102 (2d ed. 1990). An independent contractor is "a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of

---

[4] However, it is a rule of law that a master generally will not be vicariously liable for tortious acts committed by a servant traveling to or from the place of employment, unless the servant is traveling in a vehicle provided by the employer for that purpose. *Krause v. W. Cas. & Surety Co.*, 3 Wis. 2d 61, 70, 87 N.W.2d 875 (1958); Wis JI—Civil 4040.

the undertaking." Restatement (Second) of Agency, § 2(3); *see also Wagner v. Cont'l Cas. Co.,* 143 Wis. 2d 379, 421 N.W.2d 835 (1988); Wis JI—Civil 4060. The use of the label "independent contractor" in the contract between the parties is not by itself dispositive; the test looks beyond labels to factual indicia of control or right to control. *Pamperin,* 144 Wis. 2d at 201.

¶ 25.  The doctrine of respondeat superior retains the attributes of its origin as a status-based form of liability. The requirement of control or the right to control derives from the earliest manifestations of the doctrine and survives today as a justification for vicarious liability. "In early times the servant was a member of the family or of the mercantile household, and intimacy of relation is still the basic idea which today distinguishes the servant from the non-servant." Restatement (Second) of Agency § 219, cmt. a. Persons subject to vicarious liability under the early common law—keepers of servants, fathers of families—were, in fact, endowed with powers of control and as such, able to take responsibility for the conduct of others. *Id.* Describing the rationale for vicarious liability, the Restatement's commentary observes that "a servant is an agent standing in such close relation to the principal that it is just to make the latter respond for some of his physical acts resulting from the performance of the principal's business." *Id.* More specifically:

> The conception of the master's liability to third persons appears to be an outgrowth of the idea that within the time of service, the master can exercise control over the physical activities of the servant. From this, the idea of responsibility for the harm done by the servant's activities followed naturally. The assumption of control is a usual basis for imposing tort liability when the thing controlled causes harm. It is true that normally one in

control of tangible things is not liable without fault. But in the law of master and servant the use of the fiction that "the act of the servant is the act of the master" has made it seem fair to subject the non-faulty employer to liability for the negligent and other faulty conduct of his servants.

*Id.*

¶ 26. The modern consensus is that vicarious liability is also justified on common law policy grounds as a device for spreading risk and encouraging safety and the exercise of due care by employees/servants. *See* Mecham, *supra*, §§ 352–363, at 239—45; Reuschlein & Gregory, *supra*, § 52, at 104–07; Alan O. Sykes, *The Boundaries of Vicarious Liability: An Economic Analysis of the Scope of Employment Rule and Related Legal Doctrines,* 101 Harv. L. Rev. 563 (1987–88); William O. Douglas, *Vicarious Liability and Administration of Risk I,* 38 Yale L. J. 584 (1928–29). Exposure to vicarious liability creates an incentive for masters who control or have the right to control the conduct of their servants to take steps to ensure that their servants exercise due care in carrying out the master's business. Employees (the most frequent kind of servant) are usually less able to satisfy a judgment for damages, and are therefore less responsive to the threat of tort liability than their employers. Employers (the most frequent kind of master) are usually better able financially to absorb the resulting costs of increased supervision and safety measures or to insure against the risk.

¶ 27. Although the rationale for vicarious liability has expanded and the circumstances of its application have become more diverse, the basic formula for respondeat superior has remained the same: only a "master" who has the requisite degree of control or right of control over the physical conduct of a "servant" in the

performance of the master's business will be held vicariously liable. To impose vicarious liability where the requisite degree of control is lacking would not serve the original or more recent justifications for the rule. If a principal does not control or have the right to control the day-to-day physical conduct of the agent, then the opportunity and incentive to promote safety and the exercise of due care are not present, and imposing liability without fault becomes difficult to justify on fairness grounds.

B. Franchising and Franchisor Vicarious Liability

¶ 28.   Franchising is a business arrangement that takes a variety of forms, including product franchises, "business format franchises," and certain kinds of dealerships. 1 W. Michael Garner, *Franchise and Distribution Law and Practice* § 1:11–1:19 (2003). The franchise in this case is an example of business format franchising, characterized by the sale of a product or service under the franchisor's trademark pursuant to specified quality, marketing, and operational standards. *Id.* § 1:14, at 1–29. A franchise relationship is a marriage of convenience. It enables franchisors to spread the capital cost of enlarging the market for their goods and services by transferring most of those costs to local franchisees. The franchise arrangement enables the franchisor to reach new, far-flung markets without having to directly manage a vast network of individual outlets. For the franchisee, the arrangement mitigates the risks of starting a new business by enabling it to capitalize on the good will and established market associated with the franchisor's trademark or trade name. The burdens of starting and operating a business are eased considerably by the franchisor, which provides quality and

operational methods and standards, and may offer management training programs to the franchisee. *See* 1 Garner, *supra,* § 1:3–1:4.

¶ 29. Use of franchise models has mushroomed in recent years. *See* 1 Garner, *supra,* § 1:8–1:9. Once confined almost exclusively to automobile dealerships and gasoline stations, franchising has proliferated in this country, accounting for approximately $1 trillion in annual U.S. retail sales in 2000, representing over 40 percent of all U.S. retail sales. International Franchise Association, *ABC's of Franchising,* http://www.franchise.org/resourcectr/faq/q4.asp; *see also* IFA Educational Foundation, *The Profile of Franchising,* (Feb. 2000), http://www.franchise.org/edufound/profile/profile.asp; Michael R. Flynn, [Note], *The Law of Franchisor Vicarious Liability: A Critique,* 1993 Colum. Bus. L. Rev. 89, 90; 1 Garner, *supra* § 1:1, at 1–4.

¶ 30. The expansive growth in franchising has produced changes in the law governing these business relationships. *See, e.g.,* Wis. Stat. § 135.01 et seq. (2001–02), the Wisconsin Fair Dealership Law. Although the issue of franchisor vicarious liability is one of first impression in Wisconsin, the adaptation of the law of agency to the franchise context has been the subject of case law in other jurisdictions.

¶ 31. Most courts that have addressed the issue of franchisor vicarious liability have assumed that respondeat superior applies in the franchising context and have adapted the traditional master/servant "control or right to control" test to determine whether the relationship between the franchisor and franchisee should give rise to vicarious liability. As a general matter, however, the usual justifications for vicarious liability lose some force in the franchising context, and the "control or right to control" test for determining the

presence of a master/servant agency is not easily transferable to the franchise relationship.

¶ 32.   As we have noted, a franchise is a commercial arrangement between two businesses which authorizes the franchisee to use the franchisor's intellectual property and brand identity, marketing experience, and operational methods. It is quite different from a contract of employment. For one thing, it is the franchisee that pays, not the franchisor. Furthermore, although franchise agreements typically impose detailed requirements on the franchisee's operations (more on that later), the existence of these contractual requirements does not mean that franchisors have a role in managing the day-to-day operations of their franchisees. To the contrary, the imposition of quality and operational requirements by contract suggests that the franchisor does not intervene in the daily operation and management of the independent business of the franchisee.

¶ 33.   In addition, because many franchise relationships include a license to use the franchisor's trade or service mark, the detailed quality and operational standards and inspection rights specified in the franchise agreement are integral to the protection of the franchisor's trade or service mark under the Lanham Act. 15 U.S.C. § 1051 et seq.; *see also* Flynn, *supra;* Randall K. Hanson, *The Franchising Dilemma Continues: Update on Franchisor Liability for Wrongful Acts by Local Franchisee,* 20 Campbell L. Rev 91 (Winter 1997); Randall K. Hanson, *The Franchising Dilemma: Franchisor Liability for Actions of a Local Franchisee,* 19 N.C. Cent. L.J. 190. "The purpose of the Lanham Act, however, is to ensure the integrity of registered trademarks, not to create a federal law of agency . . . [or to] automatically saddle the licensor with the responsibili-

ties under state law of a principal for his agent." *Oberlin v. The Marlin Am. Corp.*, 596 F.2d 1322, 1327 (7th Cir. 1979).

¶ 34.   Accordingly, the premises of vicarious liability weaken when applied to a claim that a franchisor should be held strictly liable for the torts of its franchisee. The "control" of a franchisor does not consist of routine, daily supervision and management of the franchisee's business, but, rather, is contained in contractual quality and operational requirements necessary to the integrity of the franchisor's trade or service mark. The perceived fairness of requiring a principal who closely controls the physical conduct of an agent to answer for the harm caused by the agent is diminished in this context.

¶ 35.   Similarly, while the rationale of encouraging safety and the exercise of due care is present in the domain of franchising, as elsewhere, it has less strength as a justification for imposing no-fault liability on a franchisor. The typical franchisee is an independent business or entrepreneur, often distant from the franchisor and not subject to day-to-day managerial supervision by the franchisor. The imposition of vicarious liability has less effectiveness as an incentive for enhancing safety and the exercise of care in the absence of the sort of daily managerial supervision and control of the franchise that could actually bring about improvements in safety and the exercise of care.

¶ 36.   In light of these considerations, the clear trend in the case law in other jurisdictions is that the quality and operational standards and inspection rights contained in a franchise agreement do not establish a franchisor's control or right of control over the franchisee sufficient to ground a claim for vicarious liability as

126

a general matter or for all purposes.[5] *See Wendy Hong Wu v. Dunkin' Donuts, Inc.,* 105 F.Supp.2d 83, 87–94 (E.D.N.Y. 2000)(restaurant franchisor not vicariously liable for security lapses associated with rape of franchisee employee because franchise agreement did not give franchisor "considerable control . . . over the specific instrumentality at issue," i.e., security at franchised restaurant); *Pizza K., Inc. v. Santagata,* 547 S.E.2d 405, 406–07 (Ga. Ct. App. 2001) (pizza franchisor not vicariously liable for auto accident caused by

---

[5] A few older cases were willing to treat general quality and operational requirements in franchise agreements as indicia of control sufficient to get the plaintiff past summary judgment on that issue. *Drexel v. Union Prescription Centers,* 582 F.2d 781, 788 (3rd Cir. 1978)(grant of summary judgment to drug store reversed because general provisions in franchise agreement were so broadly drawn as to render uncertain the precise nature and scope of [franchisor's] rights vis-à-vis its franchisee); *Raasch v. Dulany,* 273 F.Supp. 1015, 1018–19 (E.D. Wis. 1967)(provisions in automobile rental franchise agreement imposing quality control requirements on franchisee create issue of fact as to whether franchisor had right of control, precluding summary judgment); *Billops v. Magness Const. Co.,* 391 A. 2d 196, 198 (Del. Sup. Ct. 1978)(provisions in hotel franchise agreement "reveal a triable issue on the question of actual agency," precluding summary judgment on a claim that the franchisor should be held vicariously liable for franchisee's harassment of hotel customer); *Singleton v. Int'l Dairy Queen, Inc.,* 332 A.2d 160, 161–62 (Del. Super. Ct. 1975)(provisions of restaurant franchise agreement suggest excessive control by franchisor over franchisee, precluding summary judgment on claim of franchisor vicarious liability for injury to restaurant customer caused by defective glass door). The more recent cases reject the general proposition that the contractual quality and operational standards in a franchise agreement give rise to a basis for franchisor vicarious liability, opting instead for a more precisely focused test, as discussed *infra,* 36–43.

franchisee delivery driver because, although franchise agreement "contains specific and even strict requirements concerning operation of franchise," franchisor was "not authorized under the agreement to exercise supervisory control over the daily activities of [franchisee's] employees"); *Viches v. MLT, Inc.,* 127 F. Supp. 2d 828, 832 (E.D. Mich. 2000) (hotel franchisor not vicariously liable for franchisee's negligent use of pesticides where franchise agreement does no more than insure "uniformity and standardization . . . of services").

¶ 37. *See also Perry v. Burger King Corp.,* 924 F.Supp. 548, 554 (S.D.N.Y. 1996)(restaurant franchisor entitled to summary judgment on claim of vicarious liability for racial discrimination by franchisee because franchise agreement did not provide that franchisor had control over employment matters at franchisee); *Schlotzsky's, Inc. v. Hyde,* 538 S.E.2d 561, 563 (Ga. Ct. App. 2000)(where patron of franchise restaurant contracted Hepatitis A from tainted food, franchise agreement establishing mandatory standards for food preparation and service quality did not mean that franchisor could "direct or control manner and method of performance of the daily operations of the franchise," affirming summary judgment in favor of franchisor); *Holiday Inns, Inc. v. Newton,* 278 S.E.2d 85, 86 (Ga. Ct. App. 1981)(where motel patron was assaulted by third party on premises of franchised motel, franchisor not vicariously liable because agreement "gave no control, or right to control, the methods or details of doing the work of the franchisee"); *Little v. Howard Johnson Co.,* 455 N.W.2d 390, 393–94 (Mich. Ct. App. 1990)(restaurant franchisor not vicariously liable for injuries of patron who slipped on ice at franchisee's restaurant,

since "uniformity and standardization of products" provisions in franchise agreement "do not affect the control of daily operations").

¶ 38. *See also Hart v. Marriott International, Inc.,* 758 N.Y.S.2d 435, 438 (2003) (hotel franchisor not vicariously liable for slip-and-fall injury sustained by hotel patron where franchise agreement did not give franchisor control over "the manner of performing the very work in the course of which the accident occurred"); *Hayman v. Ramada Inn, Inc.,* 357 S.E.2d 394, 397 (N.C. Ct. App. 1987) (motel franchisor not vicariously liable for injuries resulting from franchisee's negligent security because there was "no evidence that [franchisor] retained or exercised . . . detailed control over the daily operation of the [franchisee]"); *Smith v. Foodmaker, Inc.,* 928 S.W.2d 683, 687–88 (Tex. App. 1996)(restaurant franchisor not vicariously liable for murder of franchisee's employee by a fellow employee because franchisor had "no right of control over the hiring practices, terms or conditions of [franchisee's] employees").

¶ 39. These courts have adapted the traditional master/servant "control or right to control" test to the franchise context by narrowing its focus: the franchisor must control or have the right to control the daily conduct or operation of the particular "instrumentality" or aspect of the franchisee's business that is alleged to have caused the harm before vicarious liability may be imposed on the franchisor for the franchisee's tortious conduct. The quality and operational standards typically found in franchise agreements do not establish the sort of close supervisory control or right to control necessary to support imposing vicarious liability on a franchisor for the torts of the franchisee for all or general purposes.

¶ 40. For example, in *Pizza K.,* the Georgia Court of Appeals held that a pizza franchisor was not vicariously liable for an auto accident caused by one of its franchisee's delivery drivers, because neither the franchise agreement nor any record evidence demonstrated that the franchisor controlled the franchisee's day-to-day hiring, firing, or supervision of delivery drivers. *Pizza K.,* 547 S.E.2d at 407. Although the franchise agreement in *Pizza K.* contained many operational and quality-control standards and a right to inspect and terminate for noncompliance with those standards, the court concluded that these contractual provisions did not amount to "day-to-day supervisory control" over the franchisee, but, rather, "simply served as a means of achieving a desired level of uniformity and quality within the system of Pizza K. franchises." *Id.*

¶ 41. In *Wu v. Dunkin' Donuts,* the United States District Court for the Eastern District of New York refused to impose vicarious liability on a franchisor for a rape that occurred on the franchisee's premises because there was no evidence that the franchisor had "day-to-day control" or "a considerable degree of control over the instrumentality at issue," there, the security operations of the franchisee. *Wu v. Dunkin' Donuts,* 105 F. Supp.2d at 87. The court noted that

> [a]lthough the control that DD exercises under the franchise agreement is considerable, it is primarily designed to maintain uniform appearance among its franchisees and uniform quality among their products and services to protect and enhance the value of the Dunkin' Donuts trademark. [The franchisee] remains solely responsible for hiring, firing, and training its employees and for making all day-to-day decisions necessary to run the business.

*Id.* at 90–91. The contractual control consisting of the

imposition of quality and operational standards was insufficient to support the claim of vicarious liability. *Id.* at 94.

¶ 42. On the other hand, in *Miller v. McDonald's Corp.*, 945 P.2d 1107 (Or. Ct. App. 1997), the Oregon Supreme Court reversed a grant of summary judgment on a claim of franchisor vicarious liability where the plaintiff was injured when she bit into a sapphire stone while eating a Big Mac sandwich at a McDonald's franchise. The franchise agreement and an operations manual incorporated into the agreement established that "precise methods" of food handling and preparation were imposed by the franchisor, McDonald's. *Id.* at 1111. Because the plaintiff alleged that the franchisee's "deficiencies in those functions resulted in the sapphire being in the Big Mac," the court concluded that there was an issue of fact for trial on whether the franchisor had the right to control the franchisee "in the precise part of its business that allegedly resulted in plaintiff's injuries." *Id. Miller* appears to run contrary to the prevailing rule that quality and operational standards contained in a franchise agreement are generally insufficient to support franchisor vicarious liability. *Miller* is, however, consistent with the current consensus to the extent that it focused on the particular aspect of the franchisee's business that was alleged to have caused the harm.

¶ 43. Consistent with the majority approach in other jurisdictions, we conclude that the standardized provisions commonly included in franchise agreements specifying uniform quality, marketing, and operational requirements and a right of inspection do not establish a franchisor's control or right to control the daily operations of the franchisee sufficient to give rise to

vicarious liability for all purposes or as a general matter. We hold that a franchisor may be held vicariously liable for the tortious conduct of its franchisee only if the franchisor has control or a right of control over the daily operation of the specific aspect of the franchisee's business that is alleged to have caused the harm.

C. The Arby's-DRI Relationship

¶ 44.    Applying these principles here, we conclude that Arby's did not have control or the right to control the day-to-day operation of the specific aspect of DRI's business that is alleged to have caused the plaintiffs' harm, that is, DRI's supervision of its employees. We note first that the license agreement between Arby's and DRI contains a provision that disclaims any agency relationship. Section 11:1 provides:

> [DRI] shall at all times be deemed to be a separate and independent businessman, and neither [DRI] nor any of its employees, agents or representatives shall expressly or by implication be deemed to be an employee, agent, joint venturer, partner or representative of, or in a fiduciary relationship with, Arby's, or be authorized or empowered to create any claim, debt or obligation on behalf of Arby's or in any way bind Arby's thereto.

The label the parties attach to their relationship is informative but not dispositive, however.

¶ 45.    The license agreement contains a plethora of general controls on the operation of DRI's restaurant, the most sweeping of which is Article 4, which covers "Operating Standards and Guidelines." The centerpiece of this clause in the agreement is a requirement that DRI must operate the business "strictly in conformity

with the Manual provided by Arby's." The agreement also provides that DRI must comply with all laws and regulations pertaining to the operation of the business. The agreement requires DRI to maintain records of its business operations in a manner satisfactory to Arby's. It requires that DRI's building and equipment must meet specifications designated and approved by Arby's. DRI must obtain its supplies from a list of approved suppliers provided by Arby's. The agreement specifies standards regarding containers, uniforms, paper goods, and other packaging supplies.

¶ 46. DRI is required under the agreement to carry at least $1 million of liability insurance, naming Arby's as an additional insured. Arby's retains the right under the agreement to inspect DRI's premises and to test the products. The agreement specifies that if DRI fails to comply with the agreement or fails to operate the business in accordance with the then-current operating manual, Arby's may demand that DRI cure its failure, and may unilaterally terminate the license if DRI has not done so within ten days.

¶ 47. These provisions in the license agreement are consistent with the quality and operational standards commonly contained in franchise agreements to achieve product and marketing uniformity and to protect the franchisor's trademark. They are insufficient to establish a master/servant relationship. More particularly, they do not establish that Arby's controlled or had the right to control DRI's hiring and supervision of employees, which is the aspect of DRI's business that is alleged to have caused the plaintiffs' harm.

¶ 48. The agreement's provisions regarding the specific issue of personnel are broad and general. Section 6:1 of the agreement provides that DRI is required "to hire, train, maintain and properly supervise suffi-

cient, qualified and courteous personnel for the efficient operation of the Licensed Business." Section 6:2 states that someone in charge at the restaurant is required to complete a management training seminar conducted by Arby's. The operating manual provides guidelines for hiring, training, and supervising employees in accordance with applicable labor laws and to achieve an efficient, courteous, and satisfied work force.

¶ 49.  By the terms of this agreement, DRI has sole control over the hiring and supervision of its employees. Arby's could not step in and take over the management of DRI's employees. Arby's right to terminate the relationship because of an uncured violation of the agreement is not the equivalent of a right to control the daily operation of the restaurant or actively manage DRI's work force. Accordingly, we agree with the court of appeals and the circuit court that there is no genuine issue of material fact as to whether DRI is Arby's servant for purposes of the plaintiffs' respondeat superior claim against Arby's: clearly it is not. Arby's cannot be held vicariously liable for DRI's alleged negligent supervision of Pierce.

## IV. CONCLUSION

¶ 50.  We conclude that the quality, marketing, and operational standards and inspection and termination rights commonly included in franchise agreements do not establish the close supervisory control or right of control over a franchisee necessary to support imposing vicarious liability against the franchisor for all purposes or as a general matter. We hold that a franchisor may be subject to vicarious liability for the tortious conduct of its franchisee only if the franchisor had control or a right of control over the daily operation of the specific aspect of the franchisee's business that is alleged to

have caused the harm. Because Arby's did not have control or a right of control over DRI's supervision of its employees, there was no master/servant relationship between Arby's and DRI for purposes of the plaintiffs' respondeat superior claim against Arby's. Arby's cannot be held vicariously liable for DRI's negligent supervision of Pierce.

*By the Court.*-The decision of the court of appeals is affirmed.

¶ 51.    Justice JON P. WILCOX did not participate.