MacLeod-Mancuso, Bonnie H., J.
This matter is before the Court on Defendants,’ Julie Coleman (Coleman), Express Services, Inc. (Express), William Stark d/b/a Express Personnel Services (Stark), and Cheryl Weagraff (Weagraff), motion for partial summary judgment, pursuant to Mass.R.Civ.P. 56, against Plaintiff Coworx Staffing Services LLC (Coworx). Coworx filed suit alleging four counts: breach of duty of loyalty against Coleman (count one); breach of contract against Coleman (count two); interference with advantageous business relations against all Defendants (count three); and violations of G.L.c. 93A against Express and Stark (count four). Express seeks summary judgment on counts three and four, Stark seeks summary judgment on count four, and all Defendants seek summary judgment for all of Coworx’s claims that assert damages based on lost business from Injectron-ics.[2] For. the reasons stated below, Express’s motion for summary judgment is ALLOWED with respect to counts three and four, Stark’s motion for summary judgment is ALLOWED with respect to count four, and Express, Stark, Coleman, and Weagraffs motion is DENIED with respect to the Injectronics claims.

BACKGROUND

Coworx is a temporary staffing company. Express is a temporary staffing company and a competitor of Cow-orx. Stark is a franchisee of Express. Through the Franchise Agreement, dated October 23, 2002 and amended February 14, 2005, Stark had permission to use Express’s trademark and its system to operate a temporary staffing company. The Franchise Agreement stated that Express, the franchisor, would provide the following for Stark: accounting and bookkeeping records, insurance and employee liability accounts, employment manuals, supplies, sales programs to assist in the hiring process, and training programs.[3] The franchisee, Stark, was responsible for developing and managing the staffing business, implementing Express programs, and maintaining hours as directed by Express.[4] The Franchise Agreement also stated that with respect to temporary and contract staffing, Stark “must actively be involved in the day-to-day operation of the business or [Stark] must hire a [sic] Express Professional Staffing manager.” Stark alleges that he controlled the hiring, firing, and supervision of his employees.
Coleman worked as an employee of Coworx from August31, 1998 to January 3, 2005.[5] From August 31, 1998 to December 2003, Coleman worked in Hudson, Massachusetts as a branch manager where one of her responsibilities was to manage client accounts. In January 2004, Coleman began serving as the branch manager of the Marlborough office. On January 21, 2004, Coworx and Coleman executed a Confidentiality and Non-Competition Agreement (Agreement). The Agreement prohibited Coleman from working for a competitor of Coworx for a period of one year after leaving the company, and covéred a fifteen-mile radius from the Marlborough and Hudson branches.[6]
Weagraff worked for Coworx from 1984 to December 2003. On or about December 31, 2003, Weagraff resigned from Coworx and began new employment with Employment Network of New England, LLC. On February 3, 2004, Weagraff began working for Stark. After Weagraff left Coworx, she maintained her friendship with Coleman and would speak to Coleman on the telephone. In November 2004, Weagraff invited Coleman to interview with Stark. Coleman accepted Stark’s offer of employment on December 17, 2004, but she did not resign from Coworx until January 3, 2005. On January 10, 2005, Coleman began working for Stark who is her current employer. On April 15, 2005, Stark discharged Weagraff.
*168 Injectronics is a former customer of Coworx and a current customer of Stark. Since 2003, Carlo Bosco (Bosco) has served as the human resources director of Injectronics and he arranged for Injectronics’ temporary staffing needs. Stancast is a subsidiary of In-jectroncis and Bosco is also responsible for the temporary staffing needs of Stancast. As employees of Coworx, Coleman and Weagraff handled the Injectron-ics account. Both worked with Bosco to arrange for the placement of temporary workers. Coworx did not have a contract with Injectronics.
Defendants argue that in December 2004, Bosco became dissatisfied with Coworx because of poor billing practices. Bosco testified, that in December 2004, Injectroncis became dissatisfied with Coworx because “service had gone downhill,” Coworx provided non-English speaking employees which hindered business, and Bosco was not happy with Coleman’s services. Coworx contends that Bosco was not dissatisfied with its services in December 2004 as evidenced by Injectronics’s continued business with Coworx until October 2005.[7] Coleman testified that in December 2004 she told a co-employee, Pamela Raimo, that decreased business was due to a work slowdown, which was common for Injectronics.
On December 22, 2004, while Coleman was still employed by Coworx, she told Weagraff, then an employee of Stark, that Stancast had an opening for a clerical position. Weagraff telephoned Bosco and although the Stancast opening was not discussed, Bosco decided to use Stark to staff shift work at Injectronics. During their telephone conversation, Bosco and Weagraff discussed the mark-up arrangement between Injectronics and Coworx. That same day, Bosco emailed Weagraff to confirm that Stark would manage the Injectronics shift work and mentioned that he forgot to ask Weagraff about a clerical position at Stancast. Meanwhile, Injectronics ended an assignment of 30 temporary employees with Cow-orx. This assignment was the staff shift work that Weagraff began to handle on behalf of Stark.
On February 8, 2005, Coworx filed the present action alleging four counts: Coleman breached her duty of loyalty to Coworx (count one); Coleman breached the Agreement (count two); Stark, Express, Coleman, and Weagraff intentionally interfered with Coworx’s advantageous business relations with several of its clients including Injectronics (count three); and Express and Stark violated G.L.c. 93A (count four). On February 15, 2005, this Court (Houston, J.) entered a preliminary injunction against Stark, Express, and Coleman to enforce the Agreement.[8] Express now seeks summary judgment on count three and four, Stark seeks summary judgment on count four, and all Defendants seek summary judgment on all of Coworx’s claims that assert damages based on lost business from Injectronics.

DISCUSSION

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Comm’r of Corr., 390 Mass. 419, 422 (1983); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. Gen. Motors Corp., 410 Mass. 706, 716 (1991).

I. G.L.C. 93A

General Laws, chapter 93A, section 11 provides in pertinent part: “Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, ... as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two . . . may . . . bring an action in the superior court...” Claims by a former employer against his former employee for breach of duty as an employee are not within the scope of G.L.c. 93A. See Manning v. Zuckerman, 388 Mass. 8, 14 (1983); Second Boston Corp. v. Smith, 377 Mass. 918, 918 (1979). In Informix, Inc. v. Rendell the Appeals Court held that a former employer’s suit against a former employee for violation of a non-compete agreement fell outside the s cope of G. L. c. 9 3A regardless of whether that violation occurred during or after the employment relationship. 41 Mass.App.Ct. 161, 162-63 (1996). The Informix court reasoned that “[e]mployment agreements between an employee and his employer do not constitute either ‘trade’ or ‘commerce.’ ‘[DJisputes arising from an employment relationship between an employee and the organization that employs him. . . are not covered by the c. 93A remedies afforded in commercial transactions . . . Contract disputes between an employer and an employee . . . are principally private in nature and do not occur in the ordinary conduct of any trade or business as contemplated by the statute.’ ” Id. (internal quotations and citation omitted.) Cf. Peggy Lawton Kitchens, Inc. v. Hogan, 18 Mass.App.Ct. 937, 940 (1984) (chapter 93A applicable to employer’s suit against former employee where the employee used a ruse to discover the employer’s secret recipe, the employee did not use the trade secret until after he left the employer’s business, the parties did not enter into a non-compete agreement, and the employee’s conduct was not within the scope of his employment).
*169 While the Supreme Judicial Court and the Appeals Court have not directly considered whether a former employer can sue its former employee’s current employer under c. 93A, this Court is guided by other Superior Court decisions. In Intertek Testing Servs. v. Curtis-Strauss, this Court held that a former employer did not have an actionable claim under c. 93A against a former employee’s current employer for a willful breach of a non-compete agreement. Civil No. 98-903F (Middlesex Super.Ct. Aug. 7, 2000) (Gants, J.). Judge Gants stated: “If the actual willful breach of a non-compete agreement by an employee is not actionable under c. 93A because the claim arose from the employment relationship, then the conduct of a third party to induce such a breach must also not be actionable because this claim, too, arose from the employment relationship.” Id. The Intertek court went on to examine the policy rationale behind non-compete agreements and the current employer’s burden in litigating the enforceabiliiy of such agreements. Id. The court reasoned that “(i]f c. 93A applied to these disputes, with its provisions for treble damages and the allowance of attorneys fees, the delicate, uncertain balance that presently applies to these cases would be dramatically altered. A competitor who is contemplating hiring an employee with a non-compete agreement may find the financial risk of litigation so great that such employees may effectively be unable to find work in their field, regardless of the reasonableness of their non-compete agreements.” Id.
In Oceanair, Inc. v. Katzman, this Court reaffirmed that a former employer could not sue its former employee’s current employer for a willful breach of a non-compete agreement under c. 93A because the claim arose from the employment relationship. Civil No. 00-3342 (Suffolk Super.Ct. Jan. 22, 2002) (van Gestel, J.) [14 Mass. L. Rptr. 414] (citations omitted). But see Professional Staffing Group v. Champigny, Civil No. 04-852A (Suffolk Super.Ct. Nov. 18, 2004) (Sikora, J.) (chapter 93A applied to a former employer’s suit against its former employee’s current employer for violation of a non-compete which occurred well after the termination of the employment relationship, and involved activity in the open marketplace, and not “intra-employment conduct”); Junker Assocs. v. Enes, Civil No. 00-2098C (Essex Super.Ct. Sept. 5, 2002) (Lauriat, J.) (upholding applicability of c. 93A claim to dispute between an employee’s former and current employers because the dispute arose between “two discrete business entities,” and occurred in trade or commerce that was “independent of the employment relationship”).
Here, Coworx contends that Express and Stark should be held liable for unfair trade practices under c. 93A. This Court, however, agrees with the Intertek and Oceanair courts that c. 93A does not apply to disputes arising from the employment relationship, and Coworx’s allegation that Express and Stark induced Coleman to breach her non-compete agreement with Coworx arises from an employment relationship. Therefore Coworx’s c. 93A claim (count four) will be dismissed.

II. Intentional Interference with Advantageous Business Relations

To prove a claim of intentional interference with advantageous business relations, a plaintiff must show that: (1) he had a contract with a third parly; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions. G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991), citing United Truck Leasing Corp. v. Geltman, 406 Mass 811, 812-17 (1990); Pembroke Country Cub v. Regency Sav. Bank, 62 Mass.App.Ct. 34, 38 (2004).
Express contends that Coworx has failed to identify or allege any intentional acts of encouragement to establish the third element of its claim. Express further argues that it is not vicariously liable for the acts of its franchisee, Stark, or Stark’s employees. The Court finds both of Express’s arguments convincing. In examining the facts in the light most favorable to the non-moving party, Coworx, this Court finds that Coworx has not alleged any facts that can be construed as intentional acts by Express either to urge Coleman to breach her non-compete agreement or to encourage her to use confidential information to solicit Coworx customers. Because Express is not directly liable for intentional interference with advantageous business relations, the Court must examine whether Express may be liable under an alternate theoiy.
The principle of respondeat superior applies if it “could reasonably be found on the evidence together with all permissible inferences ‘that the relation of master and servant existed at the time the plaintiff was injured, whereby the . .. act of the servant was legally imputable to the master. It is not necessary that there be any actual control by the alleged master to make one his servant or agent, but merely a right of the master to control. If there is no right of control there is no relationship of master and servant.’ ” Cowan v. E. Racing Ass’n, 330 Mass. 135, 141 (1953), quoting Khoury v. Edison Elec. Ruminating Co., 265 Mass. 236, 238 (1928). Because the Supreme Judicial Court and the Appeals Court have not applied “the right to control test” to the franchisor-franchisee relationship, this Court will examine how other jurisdictions apply that test.
The franchise relationship is very different in nature from the traditional master/servant relationship applicable to a contract for employment. The franchisor must exert some degree of control over the franchisee to protect its trade or service mark. See The Trademark Act of 1946 (LanhamAct), 15 U.S.C. §1127 (2000). As a consequence, the majority of courts look to whether the franchisor exercised control over the day-to-day operations of the franchisee or controlled through the franchise agreement the instrumentality *170 which caused the harm. See Kerl v. Dennis Rasmussen, Inc., 682 N.W.2d 328, 338-40 (Wis. 2004) (restaurant franchisor not vicariously liable for franchisee’s negligent supervision of employees where the franchisor had no control or right of control over the daily hiring and supervision of the franchisee’s employees); see also Evans v. McDonald’s Corp., 936 F.2d 1087, 1090 (10th Cir. 1991) (franchisor not liable as an employer under Title VII even though it provided the manner of the franchise’s operations, frequent inspections, and training for employees, it did not have control over employment relations); Wendy Hong Wu v. Dunkin’ Donuts, Inc., 105 F.Sup.2d 83, 87-94 (E.D.N.Y. 2000) (franchisor not vicariously liable for franchisee’s security deficiencies because the franchise agreement did not give the franchisor “considerable control . . . over the specific instrumentality at issue”); Viches v. MLT, Inc., 127 F.Sup.2d 828, 832 (E.D.Mich. 2000) (hotel franchisor not vicariously liable for franchisee’s negligent use of pesticides where the franchise agreement only ensured “uniformity and standardization ... of services”); Jones v. Filer, Inc., 43 F.Sup.2d 1052, 1056-58 (W.D.Ark. 1999) (franchisor not vicariously liable for franchisee or its employees even though franchise agreement addressed training programs, advertising, hours of the franchisee’s operation, and decor; franchisor did not exercise control over hiring, firing, and supervising of employees); Hatcher v. 7-Eleven and Southland Corp., 956 F.Sup. 387, 392 (E.D.N.Y. 1997) (franchisor not franchisee’s employer under Title VII even though it provided an administrative payroll service, checks, unemployment benefits, workers’ compensation insurance, payroll insurance, and social security contribution, because franchisor did not hire, fire, or supervise the franchisee’s employees); Perry v. Burger King, Corp., 924 F.Sup. 548, 554 (S.D.N.Y. 1996) (restaurant franchisor could not be held vicariously liable for race discrimination by franchisee because the franchise agreement did not allow the franchisor control over employment issues); Vandemark v. McDonald’s Corp., 904 A.2d 627, 636 (N.H. 2006) (restaurant franchisor not vicariously liable for attack on franchisee’s employee because the franchisor established uniformity and standardization of products and services and did not exercise control over security operations); Pizza K., Inc. v. Santagata, 547 S.E.2d 405, 406-07 (Ga.Ct.App. 2001) (pizza franchisor not vicariously liable for franchisee delivery driver’s accident because franchisor did not supervise the day-to-day activities of the franchisee’s employees); Little v. Howard Johnson Co., 455 N.W.2d 390, 393-94 (Mich.Ct.App. 1990) (restaurant franchisor not vicariously liable for injuries of franchisee patron who slipped on ice because franchise agreement provided for “uniformity and standardization of products,” and did not give the franchisor control over daily operations). But see Butler v. McDonald’s Corp., 110 F.Sup.2d 62, 67-68 (D.R.I. 2000) (court held franchisor vicariously liable for franchisee’s negligent failure to repair the premises because of indicia of general control); Miller v. McDonald’s Corp., 945 P.2d 1107, 1111 (Or.Ct.App. 1997) (court held franchisor could be vicariously liable where franchisee’s patron bit into a Big Mac sandwich that contained a sapphire stone because the franchise agreement provided “precise methods” of food handling and preparation); Greil v. Travelodge Int’l Inc., 541 N.E.2d 1288, 1292-94 (Ill.App.Ct. 1989) (franchisor liable for franchisee under enterprise the-oiy because franchisor benefitted in profits and goodwill from the franchise and should bear the burdens).
In Kerl, the Wisconsin Supreme Court discussed the policy concerns behind vicarious liability and stated that applying strict liability to a franchisor for the acts of its franchisee would be unfair because the franchisor’s control usually “does not consist of routine, daily supervision and management of the franchisee’s business, but, rather, is contained in contractual quality and operational requirements necessary to the integrity of the franchisor’s trade or service mark.” Kerl, 682 N.W.2d at 338. Further, imposing vicarious liability prevents the parties from enumerating in the franchise agreement the benefits and burdens each should enjoy, which is an essential component inherent to the franchise relationship. Id. at 336-37. Holding the franchisor liable when it is not in the most effective position to supervise or take the necessary precautions may even entice franchisees to cut comers. Id.
Here, Coworx argues that Express is vicariously liable for the actions of Stark and Stark’s employees because of the franchisor-franchisee relationship. Under the “right to control” test, Coworx claims that Express exercises control over every aspect of Stark’s business. Cow-orx points to the Franchise Agreement which provides Express with rights over employee training programs, employee handbooks, supplies such as computers, payroll supervision, and insurance coverage and liability. These provisions, however, establish a system of uniformity and standardization for the franchisee to run a temporary staffing agency. Absent from the Franchise Agreement is an explicit provision giving Express the right to control Stark’s employees on a day-to-day basis. In fact, the language of the agreement states that Stark “must be actively involved in the day-to-day operation of the business or [Stark] must hire, a [sic] Express Professional Staffing manager.” Furthermore, Coworx has not offered evidence disputing that Stark maintained exclusive control over the hiring, firing, and supervision of his employees.
For the reasons stated, this Court finds that there is no genuine issue of material fact concerning whether an agency relationship exists between Express and Stark.[9] Express is not vicariously liable for the acts of Stark or Stark’s employees; therefore, Express’s motion for summary judgment will be allowed as to count three.

*171
III. Injectronics

All Defendants seek summary judgment as to all claims that assert damages based on lost business from Injectronics. Defendants contend that Weagraff was permitted to solicit business from Injectronics so long as she did not use improper means because Injectronics was not contractually obligated to Coworx. Further, the information relating to the Stancast clerical opening was not a trade secret, and even if it was, Weagraff did not utilize this information in her communications with Bosco. Lastly, Defendants argue that Coworx cannot show that their conduct caused Coworx’s loss of the Injectronics business. Defendants assert that the lost business is not attributable to their conduct but rather a direct result of Bosco’s dissatisfaction with Coworx’s poor billing practices.
In viewing the facts in the light most favorable to Coworx, this Court must accept the following as true: Injectronics was satisfied with Coworx’s services through at least December 2004, Injectronics continued to use Coworx until October 2005, and Injectronics decreased its business with Coworx in 2005 because of a work slowdown which was not unusual for the company. As a result, there is a genuine issue of material fact concerning the cause of Injectronics’ conclusion of its business relationship with Coworx. Therefore, summary judgment is inappropriate at this time.

ORDER

For the reasons stated above, it is hereby ORDERED that Express’s motion for summary judgment is ALLOWED with respect to counts three and four, Stark’s motion for summary judgment is ALLOWED with respect to count four, and Defendants’ motion for summary judgment is DENIED with respect to the remaining claims that assert damages based on lost business from Injectronics.

Injectronics is a former customer of Coworx and a current customer of Stark.

This list is not exhaustive of all the provisions that are contained within the Franchise Agreement.

The Franchise Agreement also stated that Stark could use Express “names, trademarks, and service marks on forms, brochures, signs, or advertising materials only as approved by [Express].. .’’The Franchise Agreement required Stark to keep accurate business records and provided that Express had the right to inspect those records and audit the accounts at all reasonable times. Stark also had to “adhere to the rules, regulations, standards, and business ethics as established in [Express] training course [s] and manuals, or as they are amended or modified.”

To minimize confusion, this Court will refer to Coworx and its predecessor in interest, Agentxy Staffing, as Coworx.

The Agreement stated in section 2.2(a):
The Employee shall not, during the term of the Employee’s employment, and for a period of one (1) year commencing the date of the Employees’ termination of employment with the Company, compete with the Company, either as an individual for his or her own account, or as a partner, joint venturer, employee, agent, salesman, consultant, officer, director, or shareholder of a corporation, or otherwise, within a fifteen (15) mile radius of any of the Company’s offices at which the Employee worked when employed by the Company . . .

Coworx offers evidence that Injectronics increased its business with Coworx throughout the fall of 2004 with orders of $34,174 in September, $45,450 in October, $51,822 in November, and $69,973 in December. While business escalated throughout the fall, this evidence is irrelevant to Coworx’s argument that Injectronics was satisfied with Cowoix’s performance because Bosco did not claim any dissatisfaction until December 2004.

The preliminary injunction states:
1. Defendant Julie Coleman is preliminarily enjoined until further Order of the Court from:
(i) disclosing any or all of the confidential and trade secret business information of. . . Coworx Staffing Services LLC (“Cowoix”) to her present employer or any other person or entity or utilizing the same for her own benefit at any time;
(ii) soliciting business, directly or indirectly, from any Coworx customers, including but not limited to Injectron-ics, with which she placed a referral while employed by Coworx; and
(ill) contacting or communicating with any CoWoix employee who she placed with a customer while employed at Coworx, with the intent, purpose, or effect of inducing or encouraging said employee to leave his or her employment with Coworx or to breach his or her employment agreement with or other obligations to Coworx.
2. Defendants Express Personnel Services and William Stark are hereby preliminarily enjoined until further Court Order from: (i) utilizing any Cowoix trade secret or confidential information disclosed or utilized by Coleman; or (ii) encouraging, soliciting, permitting or requiring Julie Coleman to engage in any of the activities prohibited in paragraph 1 above.

Coworx argues that even if Express and Stark do not have an agency relationship, Express is still liable because of its failure to ensure compliance with the preliminary injunction. This argument is irrelevant to Coworx’s claim for intentional interference with advantageous business relations. If Coworx seeks to enforce the preliminary injunction, its proper recourse is to file a contempt action with this Court.